```
1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF TEXAS
2                            BROWNSVILLE DIVISION
3                                    )
        REX TERRY, ET AL            )
4                                    )
                                     )
5              PLAINTIFFS,          )
                                     )  CIVIL ACTION
6       VS.                          )
                                     )  NO.: B-03-190
7                                    )
        PARKERCO, INC.              )
8                                    )
                                     )
9              DEFENDANT.           )
10
        ***********************************************************
11                      ORAL DEPOSITION OF
12                        REX W. TERRY
13                      SEPTEMBER 2, 2004
14      ***********************************************************
15      ORAL DEPOSITION OF REX W. TERRY, produced as a witness at
16      the instance of the DEFENDANT, and duly sworn, was taken in
17      the above-styled and numbered cause on the 2nd of September,
18      2004, from 10:00 a.m. to 3:10 p.m., before Kathy Miller, CSR
19      in and for the State of Texas, reported by machine shorthand,
20      at the law offices of Fulbright & Jaworski, 1301 McKinney,
21      Suite 5100, Houston, Texas, pursuant to the Federal Rules of
22      Civil Procedure and the provisions stated on the record or
23      attached hereto.
24
25
```

**Page 2**

1  **A P P E A R A N C E S**

2

3  FOR THE PLAINTIFFS:
   MR. WILLIAM W. THOMPSON, III

4  GRISSOM & THOMPSON, LLP
   609 WEST 10TH STREET

5  AUSTIN, TEXAS 78701

6

7  FOR THE DEFENDANT:
   MS. JULIE A. HARDIN
   FULBRIGHT & JAWORSKI

8  1301 MCKINNEY, SUITE 5100
   HOUSTON, TEXAS 77010

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1        INDEX CONTINUED
2           EXHIBITS
3  NO.DESCRIPTION                              PAGE
4  17 May 13, 1997 letter to Rex Wayne Terry from
      Dianne Michalski.......................... 131
5  18 June 5, 1997 letter to Rex Wayne Terry from
      Dianne Michalski.......................... 131
6  19 U.S. Customs Service Courtesy Notice of Entries
      Scheduled to Liquidate.................... 146
7  20 Excerpt from CFR 158.12.................... 157
8  21 Document entitled "81-144, Late or Improper
      Shipments of Merchandise"................. 157
9  22 U.S. Customs Service Courtesy Notice of Entries
      Scheduled to Liquidate.................... 157
10 23 Photocopy of Wire Transfer (Copy illegible)..... 160
   24 U.S. Customs Courtesy Notice................. 166
11 25 U.S. Customs Service Bills.................... 168
   26 Handwritten notes............................ 171
12 27 Handwritten note to Garland from Rex Terry...... 178
   28 Handwritten memo dated 3-5-03 to Jorge Torres
13    from Rex Terry with attached deposit tickets..... 187
   29 Handwritten memo dated 5-23-03 to Garland
14    Pritchard from Rex Terry with attached Past
      Due Notice................................ 190
15 30 AT&T call detail............................ 197
   31 Memorandum to Rex Terry from Garland Pritchard
16    dated June 23, 2003....................... 210
   32 Plaintiffs' Answers to First Set of
17    Interrogatories........................... 221
   33 (Skipped in sequence).
18 34 June 18, 2003 letter to Rex Wayne Terry from
      Dee Baskerville, with attachments........... 230
19 35 U.S. Customs Service Formal Demand on Surety
      for Payment of Delinquent Amounts Due........... 231
20 36 09/18/2003 Notice of Action................. 231
   37 6-23-03 handwritten memo to Jorge Torres and
21    Garland Pritchard from Rex Terry and June 18,
      2003 letter to Rex W. Terry from Dee
22    Baskerville............................... 233
23
24
25

**Page 3**

1           INDEX
                              PAGE
2
3  Appearances...............................  2
4
   Stipulations..............................  5
5
   REX W. TERRY
6     Examination by Ms. Hardin...............  5
7
   Signature and Changes.....................  234
8
   Reporter's Certificate....................  236
9
10
           EXHIBITS
11 NO.DESCRIPTION                          PAGE
12 1 Amended Notice of Oral Deposition of Rex Terry...  13
   2 Sketch..................................  61
13 3 Excerpt from day planner.................  71
   4 Parker & Co invoice 04/30/1996 with attached
14    Frano invoice..........................  97
   5 Parker & Co invoice 06/19/1996 with attached
15    Frano invoice..........................  100
   6 Parker & Co invoice 04/30/1996 with attached
16    Frano invoice..........................  103
   7 Parker & Co invoice 05/31/1996 with attached
17    Frano invoice..........................  103
   8 XL Insurance Past Due Notice.............  115
18 9 May 1, 1997 letter to Pete Martinez from Larry
      Mitchell...............................  127
19 10 Notice of Action, Dec 4, 1996...........  131
   11 Department of the Treasury Request for
20    Information............................  131
   12 Notice of Action, January 29, 1997......  131
21 13 February 5, 1997 letter to Pete Martinez from
      Rex Terry..............................  131
22 14 May 14, 1997 letter to Pete Martinez from
      Rex Terry..............................  131
23 15 May 1, 1997 letter to Pete Martinez from
      Larry Mitchell.........................  131
24 16 Copies of Sunbelt Surplus Valve checks........... 131
25

**Page 5**

1        THE REPORTER: Pursuant to the Rules?
2        MS. HARDIN: Uh-huh.
3           REX W. TERRY,
4  having been first duly sworn, testified as follows:
5           EXAMINATION
6  BY MS. HARDIN:
7     Q.   Will you please state your full name for the record?
8     A.   Rex Wayne Terry.
9     Q.   Mr. Terry, my name is Julie Hardin; and I represent
10 Parker in this case. Do you understand we're on opposite
11 sides of the lawsuit you filed?
12    A.   Yes.
13    Q.   Do you understand you have been placed under oath?
14    A.   Yes.
15    Q.   And that you have sworn to tell the truth today?
16    A.   Yes.
17    Q.   And that your testimony here today can be used in
18 front of a Judge and jury as if the Judge and jury were here
19 right now? Do you understand that?
20    A.   Yes.
21    Q.   If you don't understand any of my questions, will
22 you stop me and let me know?
23    A.   Yes.
24    Q.   We're both doing a good job right now, but it's
25 important that we don't speak over each other so Kathy can

KATHY MILLER, CSR
NELL MCCALLUM & ASSOCIATES - HOUSTON, TX  (713) 861-0203

1  understand what happened with this pipe --
2      A.   Okay.
3      Q.   -- so --
4      A.   This pipe was at Cactus 43 yard in Chiapas,
5  Mexico --
6      Q.   Okay.
7      A.   -- at their pipe yard.
8      Q.   And you got that information from Frank Avila?
9      A.   Yes.
10      Q.   Okay.
11      A.   It was a public bid -- up for public bid through the
12  PEMEX system called UDA.  We submitted a bid through Frank's
13  company.  I believe it was Franco.  He called it Franco.  We
14  were successful bidder.
15      Q.   I want to stop you for a second.  Did you do -- go
16  through the bidding process in Mexico, or had you -- or were
17  you still in the United States when all this --
18      A.   Frank Avila went to Mexico City to the PEMEX office,
19  to the 43rd floor, where they do all their selling, and
20  submitted a bid.
21      Q.   How did you decide how much you were willing to bid?
22      A.   I had it sold, called different pipe buyers here in
23  the States; and --
24      Q.   You had it what?  I didn't understand you.
25      A.   I called different buyers that I would sell to here

1  in the States, got a ballpark idea of what I could sell it
2  for.
3      Q.   Well, how did you find out exactly what kind of pipe
4  it was?
5      A.   I went and inspected it myself.
6      Q.   Well, that's what I am trying to understand.  At
7  what point did you bid on it?  At what point did you go to
8  Mexico?  That's what I'm not clear on.
9      A.   Well, you would about -- I mean, it's a chain of
10  events.  You would go inspect it to see the quality of it.
11           MR. THOMPSON:  Rex, she doesn't know that.
12  She wants you to take her through this process.
13           THE WITNESS:  Well --
14           MS. HARDIN:  Right.
15           THE WITNESS:  -- I am trying to, but I
16  don't -- I didn't realize I had to simplify it that much.
17           MS. HARDIN:  Yes.
18           MR. THOMPSON:  She's asking you to tell
19  exactly what happens.  We are going to be here all day unless
20  you kind of take here step-by-step.
21      A.   I went -- Frank told me the pipe was there.  I fly
22  to Villahermosa, Mexico.  I don't think we need to go to all
23  this.
24      Q.   (BY MS. HARDIN)  Yes, we do.
25      A.   I can probably tell you the hotel I stayed in.

1      Q.   And I don't need like the hotel; but I'm not in the
2  Customs business, so I don't know what is so common to you of
3  how it works.
4      A.   Okay.
5      Q.   So, that's what --
6      A.   I went and inspected this pipe at Cactus 43.  That's
7  what they call their -- their yard, their patio.  Cactus is
8  PEMEX's yard.  This is still owned by PEMEX, the national oil
9  company of Mexico.
10      Q.   Okay.  Before you went to Mexico, I assume Frank
11  Avila told you what kind of pipe it was going to be?
12      A.   He said that, at this particular time, I think there
13  were four large lots for sale.
14      Q.   But did he give you any idea of what kind of pipe
15  you should expect to see?
16      A.   Okay.  Probably he could have.  All the pipe that we
17  bid on and bought, was of a certain size and a certain
18  condition.  It had already been inspected through the PEMEX
19  facility.
20      Q.   Did you get any paperwork from Frank Avila or anyone
21  else before you went to Mexico?
22      A.   Maybe something how many joints.  Nothing -- I mean,
23  used equipment, you have to inspect yourself.
24      Q.   Okay.  So, you go to Mexico?
25      A.   Everything -- when you buy something used is bought

1  as-is/where-is.  You inspect.  You take the risk.  You take --
2      Q.   So, it's not like you get something in the mail that
3  says, "This is the kind of pipe we're selling.  Come to Mexico
4  if you want"?
5      A.   Similar.  They put out public bid.  PEMEX publicized
6  it through the Mexican papers.  Now they have a web site in
7  the United States you can look at and see everything they're
8  selling.
9      Q.   So, before you went, did you have some paperwork
10  that suggested to you what kind of pipe was -- they were
11  selling?
12      A.   Probably, or he told me there were so many joints,
13  with like four big lots.
14      Q.   Do you have any of that paperwork?
15      A.   No.
16      Q.   So, you go to Mexico.  Tell me what happens next.
17      A.   Go inspect the pipe, visually inspect it.  When you
18  go inspect it in their pipe yard, this particular pipe we were
19  bidding on had already been inspected by PEMEX.
20      Q.   What does that mean, it had already been inspected
21  by PEMEX?
22      A.   They run it through their machines, do ultrasound
23  type things, x-ray-type things to check the quality of the
24  pipe.
25      Q.   And I would assume at that point they give you some

Page 54

1 kind of printout?
2    A.    They don't give you paperwork. Every time the pipe
3 is inspected and -- they visually mark it with a color code.
4    Q.    Okay.
5    A.    So, depending on the quality. It's a universal
6 color code.
7    Q.    And the code tells you what?
8    A.    The quality of the pipe and of the pins and the
9 boxes. That's the things on the end, the screws.
10    So, they will mark with paint -- when they're
11 turning the piece of pipe, they hold a paint brush up there
12 and put different colors on it. By those colors, you know how
13 the piping checked -- inspected.
14    Q.    And does the color indicate whether it's good pipe,
15 very good pipe, or bad pipe; or does it indicate --
16    A.    All -- all of the above.
17    Q.    Okay. Does it also tell you what kind of pipe it
18 is, in terms of steel or lead or copper?
19    A.    No. All drill pipe would be made out of the same
20 steel mixture, or whatever you want to call it. The same --
21    Q.    Is it alloy steel or nonalloy steel?
22    A.    Well, it would be an alloy. Drill -- drill pipe is
23 a very hard, specialized metal.
24    Q.    And you're saying that all drill pipe is a standard
25 formulation, if you will?

Page 55

1    A.    No, it's not standard; but it's all built within
2 certain -- certain standards. There's several different
3 grades.
4    Q.    And that's one thing I want to understand from you.
5 When you talk about drill pipe, are there many different kinds
6 of drill pipe; or does drill pipe mean something in particular
7 that anyone in your business, if you said drill pipe, they
8 would know exactly what you're talking about?
9    A.    They would know the general commodity would be drill
10 pipe. There's different sizes. Size is a big thing, which is
11 diameter. All drill pipe, unless it's special, is of a
12 standard length.
13    There are some special things. Water well drillers
14 use a smaller, shorter pipe. Oil field drilling, 99 percent
15 of them use what -- 30-foot pipe. Some of it -- it ranges
16 anywhere from 30 -- from 29 to 31; so, you average everything
17 out at 30 feet.
18    Then you got different diameters.
19    And then, to go one step further, you have different
20 grades, which is the hardness, chemistry of the metal.
21    Q.    And different kinds of metal, or just --
22    A.    Different chemistries.
23    Q.    What do you mean by that?
24    A.    Chemistries would make some pipe stiffer, harder, et
25 cetera, et cetera.

Page 56

1    Q.    And when you say different chemistries, do you
2 mean --
3    A.    It would be like 14 carat gold or 18 carat gold or
4 something like that. It's just -- it's just -- it gets
5 better.
6    Q.    But it's still alloy steel?
7    A.    Yes.
8    Q.    Okay. So, you go to Mexico; and you go to this
9 auction for PEMEX.
10    A.    It is a bid situation, not an auction.
11    Q.    Okay.
12    A.    It's a bid.
13    Q.    Explain that to me.
14    A.    You go look at it; and you submit on paper, in
15 writing, a bid in a sealed envelope; walk into a room, they
16 open them up, high bidder gets it.
17    Q.    And this is after you have inspected the pipe and
18 decided it's the type you want to buy and you have someone who
19 will purchase it, et cetera, et cetera?
20    A.    Correct.
21    Q.    When you went down there, did you inspect the pipe
22 one day then go through the bid process the next day; or how
23 did that work?
24    A.    We inspected a few days before the -- the -- because
25 the pipe wasn't located in Mexico City. The pipe is in the

Page 57

1 oil field down in veer -- Villahermosa, which is in the state
2 of Tabasco. All the bids of this particular pipe were taking
3 place in Mexico City.
4    Q.    When you say we inspected it, are you talking about
5 Frank Avila?
6    A.    Yes.
7    Q.    Did anyone else go with you to inspect the pipe?
8    A.    Not that I remember. Could have been. I mean, was
9 there -- there is always a bunch of guys down there.
10    Q.    Who manufactured the pipe?
11    A.    We don't know. I mean, it's not like Chevrolet or
12 Ford where there is a body style or a big name on the side of
13 it. And that after pipe has been machined one time, all the
14 numbers and identifying mark goes off, and they have to go
15 back and restamp it. So, when they go back and restamp it,
16 they don't -- they don't have a mill mark to say it was made
17 by Grant here in the States. They'll go back in and stamp in
18 the grades, and that's all they do.
19    So, you don't ever know, unless the pipe is new, who
20 the manufacturer was unless you had chain of command or what
21 they call -- you know, a chain of possession of it all the
22 time.
23    Q.    So, the pipe at issue in this lawsuit, you don't
24 know who manufactured it?
25    A.    No. Nobody has any idea.

15 (Pages 54 to 57)

Page 58

1    Q.   And you don't know where --
2    A.   Plus --
3    Q.   -- where it's manufactured?
4    A.   -- plus -- plus the fact that the pipe that I bought
5    in -- in Chiapas and from Cactus 43 yard is not the pipe I
6    bought -- that I looked at.  This is -- that's the next step
7    to this process.
8    Q.   Okay.  And let me -- let us -- let me just walk you
9    through this before we go on to that, because I just want to
10   focus right now on what you bought in Mexico.
11   A.   Okay.
12   Q.   The pipe that you purchased in Mexico, you don't
13   know where it was manufactured and you don't know who
14   manufactured it, correct?
15   A.   Correct.
16   Q.   Do you know what use it was put to in Mexico?
17   A.   Well, it was used for drilling pipe, for drill pipe,
18   drilling oil wells.
19   Q.   Do you have any pictures of the pipe that you
20   purchased in Mexico?
21   A.   No.
22   Q.   Is that typical, that you wouldn't take pictures
23   when you were buying something?
24   A.   It -- it depends.  And, I mean, even if I did, I
25   wouldn't have kept them.  You know, it's no good after -- you

Page 59

1    know, even these days when we get stuff by e-mail, you know,
2    after a deal is done, you delete them.
3    Q.   And you were purchasing the pipe from PEMEX?
4    A.   I was purchasing, myself, from Franco.  Actually, I
5    believe I sent Franco the money so he had the money to go pay
6    PEMEX.
7    Q.   And I want to understand exactly the type of pipe
8    you thought you were purchasing.  So, tell me what it was.
9    A.   It was -- most of it, the -- it was a large lot,
10   20-something loads.  The largest part of it was double white
11   band drill pipe.
12   Q.   What did you mean earlier when you say that you can
13   machine pipe?
14   A.   They machined -- they go back in and take a very,
15   very thin cut off of the -- one end is a box, one end is a
16   pin.  One end is female, and male.  And they go and they take
17   a real thin cut on it.
18        Well, when they do -- okay.  Can I have a piece of
19   paper?
20   Q.   There you go (indicating).
21   A.   I'm not much of an artist.  I'll try to exaggerate
22   this.
23        (Witness drawing.)
24        Okay.  Drill pipe, you have your connections
25   (indicating).  You got your two.  You got your box end, the

Page 60

1    female end; you have a male end.  Threads on the outside,
2    threads on the inside.
3        When they machine it, they take -- they start right
4    here (indicating); and they machine it all the way back.  And
5    when they do, they take this shoulder down.
6        Well, all the markings are in this area
7    (indicating).  So, when they machine it, they machine these
8    threads; and every time they do this, it shortens this length
9    right here.
10       Well, there is a certain criteria on drill pipe,
11   this (indicating) has to measure a certain dimension or it's
12   been machined too many times.  But every time they machine it,
13   it -- it reduces this distance right here; and then once it
14   gets too short, it's scrap.  It cannot be used for drilling
15   anymore.
16   Q.   And the pipe that you believed you were purchasing
17   in Mexico had not been machined too much?
18   A.   Correct.
19   Q.   And that's why it had the white band?
20   A.   Double white band, correct.  It had double white
21   bands on the pins and boxes.  If something is bad -- it can be
22   bad -- it can be bad on this end, it can be bad on this end,
23   or it can be bad in the tube; so they mark these ends, make --
24   mark each end, and they will also mark the tube.
25       If everything is white, everything is good.  Then

Page 61

1    they have got several different codes.  They got a yellow and
2    an orange and a green and a red.  If it's red, it's bad.  It
3    can't be fixed.
4    Q.   And do they machine it so that they can fix the
5    threads so that --
6    A.   If they had a chip in them or a crack in them, they
7    just get about brazed, et cetera, et cetera.
8        Now, when they're machining, the only thing they're
9    doing is taking off end-to-end differences.  The diameter
10   across the pins and the boxes is totally relative to how much
11   the pipe has been used, just how many times it's turned in the
12   hole.  That is -- is never machined.  When it gets to a
13   certain criteria, it's scrap again.
14        MS. HARDIN:  Let's go ahead and mark that as
15   an exhibit.
16        (Exhibit 2 marked.)
17   Q.   (BY MS. HARDIN)  In identifying the type of pipe
18   that you were purchasing, it was double white banded drill
19   pipe; is that correct?
20   A.   The largest portion of it, yes.
21   Q.   The -- well -- and it was alloy steel, I assume?
22   A.   Well, it was drill pipe.  I don't remember the
23   specific grade.  I just know that when we go sell used drill
24   pipe, people at my stage of the rebuilding and resale, it
25   doesn't change the price we sell the pipe for very much.  The

16 (Pages 58 to 61)

Page 62

1  guy that's selling it back to the drilling contractor, yes, it
2  would; but to the -- to the people that I sell to, it
3  wouldn't -- it wouldn't change the price much.
4      Q.  Well, when you were finding a potential buyer in the
5  United States to buy this pipe, how did you describe it to
6  them?
7      A.  Well, at the time I had the paperwork in front of
8  me.  And, you know, you go inspect it, you know, "I've got so
9  many joints of three-and-a-half or four-and-a-half, such and
10 such grade, double white band."
11     Q.  Do you have that paperwork?
12     A.  No.
13     Q.  I assume, obviously, the pipe is round pipe, not
14 flat pipe?
15     A.  Yes.
16     Q.  Do you know what its length was?
17     A.  It would have all been the 30-foot range like we
18 spoke earlier.
19     Q.  And what would the diameter have been?
20     A.  It would have been three-and-a-half,
21 four-and-a-half, and five-inch.
22     Q.  Is it a specific color?
23     A.  No.  It's just rusty.  The pipe itself is just rusty
24 looking pipe.  The only color it is, is the inspection
25 markings.

Page 63

1      Q.  Will you tell me what the difference is between
2  drill pipe, structural pipe, and line pipe?  Because I use --
3  I see that term used differently.
4      A.  And you got all three in your paperwork.
5      Q.  Yes.  And it's confusing.
6      A.  Can we stop?  I want to get a drink of water.
7          (A break was taken, 11:14 to 11:19 a.m.)
8      Q.  (BY MS. HARDIN)  Okay.  I think that when we took a
9  break, I was asking you the difference between structural
10 pipe, line pipe, and drill pipe.
11     A.  Okay.  The only thing they have in common is the
12 word "pipe."  They're all made out of some type of steel, not
13 necessarily -- some -- you know, now we're using P.V.C.s and
14 things like that on some line pipe.
15         Drill pipe, as a general term, is used for pipe that
16 is used for drilling oil wells or water wells, whether it be
17 drilling horizontally or vertically.
18         Line pipe is -- and it's -- drill pipe is also of a
19 certain range of diameters, usually going from
20 two-and-seven-eighths up to -- common size is five-and-a-half.
21 There are some six -- sixes and stuff that's real specialized.
22         Line pipe can be anything from as small as you want
23 to make it up to as big as they want to make it.  Most of it
24 is generally in the 6, 8, 10, 12, or we're talking 24-inch
25 range.  It has weld end connections, which you're -- going

Page 64

1  back to drill pipe, has a -- the -- they call it a tool joint.
2  It's a real -- very fast turning thread; so, it just takes a
3  couple of rounds to completely make it up.
4          Line pipe, most generally, is weld together, beveled
5  end and weld.  Some regular pipe is like you would use in your
6  house, or a casing in an oil well is screwed together with
7  just regular threads, which are very slow turning, takes many
8  rounds to put it together.
9          But drill pipe only -- I don't know -- only takes
10 like four rounds.  It's a real fast thread.
11     Q.  Are they both made of the same substance?
12     A.  No.
13     Q.  Okay.  What's the difference?
14     A.  Your drill pipe normally is of a harder chemical --
15 or a chemical analysis that makes it harder, tougher,
16 stronger.  It's a -- it's a piece of machinery.  It's used.
17 It's turning.
18          Line pipe, you put it -- weld it one time or screw
19 it together one time, you never touch it again.
20     Q.  So, when we think of pipelines out in the field, is
21 that line pipe?
22     A.  That would be line pipe.
23     Q.  And drill pipe would be actually pipe that's used to
24 drill for oil?
25     A.  To drill a hole in a ground -- in the ground,

Page 65

1  whether vertically or horizontally.
2      Q.  And they're both alloy steel?
3      A.  Your drill pipe is going to be some type of an
4  alloy.  Your line pipe is going to be of a different
5  chemistry.  It's going to be much softer on a normal --
6  normally.
7      Q.  But it's still steel?
8      A.  It's still -- most of the time.  Water pipe like the
9  old pipe they used to use in the cities was cast iron.  Most
10 of the water pipe they're using now is P.V.C.
11     Q.  What is structural pipe?
12     A.  It has been used, abused, weathered, past the point
13 of being used for its original intent.
14     Q.  Is pipe manufactured to be structural pipe?
15     A.  Not -- you could -- you could put a special
16 circumstance.  I know people that take plate and make
17 structural pipe.  It's a shop -- it's a backyard shade-tree-
18 type deal.  But normal, on a basis, no.
19          Structural pipe is used pipe that's pitted, used,
20 bent, that's used for road crossings.  They use it to build
21 signs with, use it to build corrals with, fences, cattle
22 guards.  For instance, probably a large percentage of your
23 structural drill pipe is used to make cattle guards out of for
24 the simple fact that it is of a higher grade of steel.  It's
25 just stronger.

17 (Pages 62 to 65)

Page 66

1   Q.   So, is structural pipe drill pipe that is no longer
2   useful for drilling wells?
3   A.   If -- if you use the term structural drill pipe, it
4   is pipe that is beyond the use of going back in the ground.
5   Q.   But it's still drill pipe?
6   A.   As the terminology -- yes, they use that terminology
7   just -- you know, that was its original intent, was drill
8   pipe. Now it's structural. It can't be used for drilling
9   anymore. It's structural.
10  Q.   It's got to be used to build things?
11  A.   Yes. It's wore out.
12  Q.   Worn out for purposes of using as drilling
13  equipment, but it still has some use in terms of structuring
14  things?
15  A.   Right. Building cattle guards, building cattle
16  pens. They use a lot of old drill pipe -- tons and tons, ship
17  loads and ship loads were sent to Italy to reinforce tunnels.
18  They would drill them and just use them for tunnels, just one
19  piece at a time. You know, drill a hole out -- not drill the
20  pipe in. They would blast the hole out and then put drill
21  pipe in it because it's so strong. It's structural.
22  Q.   How would you describe the pipe that you thought you
23  were buying in Mexico?
24  A.   The pipe I thought I was buying, like I've already
25  said, was -- that we looked at was double white.

Page 67

1   Q.   Drill pipe?
2   A.   Drill pipe.
3   Q.   How much pipe were you buying?
4   A.   I don't know the footage. It was 20 -- I don't
5   know -- 21 -- it was either 21, 22, 23 loads, something in
6   that range. Usually put about -- about 1,000 feet on a truck,
7   or 100 -- not 3,000 feet. Usually put about 100 joints. So,
8   3,000 feet times 20; 60,000 feet, something like that.
9   Q.   Was this going to be delivered in one shipment or
10  multiple shipments?
11  A.   It's multiple shipments as it crossed.
12  Q.   But all generally in the same time frame?
13  A.   Oh, within a week or two period.
14  Q.   Just how long it took to process and get it here,
15  not --
16  A.   Well --
17  Q.   -- because you're buying it --
18  A.   -- the process of the Mexican --
19  Q.   Wait. Wait. Let me finish. Let me finish.
20       The process of well -- strike that.
21       The difference in time, was it based on processing
22  it or just how long it took the trucks to come across?
23  A.   The Mexican truckers were the biggest parable.
24  Q.   So, you weren't going into it planning that you
25  would get one shipment in June and one shipment in July, or

Page 68

1   whatever?
2   A.   No. It was all delivered in a -- I don't know.
3   There's dates. I don't know what the dates were, but it would
4   have all been within like a two-week period.
5   Q.   How much did you bid on this equipment?
6   A.   I believe it was 160-something-thousand-dollars. I
7   believe. I think. Oh, there it is. You can't hardly -- well
8   I have got the original. It was $167,700.
9   Q.   And I assume there wasn't any negotiation because
10  you just bid and they accepted your bid and that's it?
11  A.   I was the high bidder at -- at -- at PEMEX.
12  Q.   And what did you plan to use the pipe for once you
13  imported it into the United States?
14  A.   Resale.
15  Q.   And you, yourself, were going to resell it? You
16  wouldn't hire a broker to sell it?
17  A.   I would resell to a -- well, I -- in my business, to
18  somebody that would go back in, rework it, retest it, and sell
19  it to a drilling contractor.
20  Q.   Who, if you recall, was the company that was going
21  to buy this pipe?
22  A.   I don't remember. I mean -- there was two or three
23  different sizes; so, I would have probably been going to two
24  or three different people. It didn't ever happen; so, I -- I
25  don't remember.

Page 69

1   Q.   You didn't have any agreement already in place. It
2   was just a kind of verbal expectation that the company was
3   going to buy the pipe?
4   A.   Absolutely, because they have to inspect theirself.
5   Q.   How did Parker first get involved in this deal?
6   A.   I went and knocked on their door and asked them if
7   they wanted to do my business; and they're in the
8   import/export business on the border, and so --
9   Q.   How did --
10  A.   -- that's how I started using them.
11  Q.   -- how did you hear about Parker?
12  A.   I drove to Hidalgo and picked up the phone book.
13  Q.   Why did you go to Hidalgo?
14  A.   Well, Hidalgo is -- Hidalgo is the actual town right
15  there which is right outside of McAllen, Brownsville, et
16  cetera, et cetera.
17  Q.   But, I mean, at what point in this process did you
18  drive to Hidalgo or Pharr and contact Parker?
19  A.   Probably after I had been to Mexico one time and was
20  fixing to buy something.
21  Q.   Well, had you ever used Parker before the pipe at
22  issue?
23  A.   Yes. I had been using them for, I don't know how --
24  what period of time. They had brought a lot of miscellaneous
25  U.S. goods returned across for me, several loads. I don't

Page 70

1  know how many. I'd say in the range of 10, 15, 20, something
2  like that.
3      Q.  Did you have any problems with any of those loads?
4      A.  I never had any problems with anything except for
5  pipe.
6      Q.  So, you -- when you hired Parker to help you on this
7  deal, you already had a relationship with Parker?
8      A.  Correct.
9      Q.  Who at Parker had you been dealing with?
10     A.  I will go ahead and give you this. The guy's name
11  that run the place at the time, his name was Pilo Walters. I
12  don't believe he's still with them. You want -- you're going
13  to want it; so, go ahead. It's that bottom one down there,
14  bottom right.
15         MS. HARDIN:  Let's mark this as Exhibit 3.
16         THE WITNESS:  Let me look at that for just a
17  second, make sure I am not giving away any company secrets.
18         MR. THOMPSON:  Too late now.
19         THE WITNESS:  No, she hasn't made a copy of it
20  yet.
21         Well, there is one of the guys I mentioned awhile
22  ago. That's a pipe dealer I deal with. There is another pipe
23  company right there I deal with, Pierce.
24         MR. THOMPSON:  Hard to read, too.
25         THE WITNESS:  Yeah.

Page 71

1          And this is the extra note that I made about Garland
2  Pritchard, and that -- you can see, that was put on a piece of
3  paper.
4          MR. THOMPSON:  You can tell her all that when
5  she asks you.
6      Q.  (BY MS. HARDIN) How do you want to handle this? Are
7  these your originals?
8      A.  No. That's a copy out of my phone book. You told
9  me to bring it, so I just -- instead of bringing my phone
10  book, I made a copy for you.
11     Q.  Thank you.
12         MS. HARDIN:  You want to mark this.
13     A.  And everything on there is the name of the people I
14  dealt with at Parker; so, that was Pilo Walters; the girl,
15  Laudas; and another guy, I believe his name was Leonel.
16         (Exhibit 3 marked.)
17     Q.  (BY MS. HARDIN) So, will you describe exactly what
18  Exhibit 3 is for us?
19     A.  It's a copy of the page out of my phone book that I
20  carry with me.
21     Q.  In terms of this deal with the pipe at issue, at
22  what point did you contact Parker?
23     A.  I would have bought -- I would have contacted them
24  before I turned my bid in, before I ever bid this $167,000.
25     Q.  Do you recall who at Parker you spoke with? Would

Page 72

1  it have been Pilo Waters [sic]?
2      A.  More than likely, when we were talking about big
3  deals, it was -- we went to the conference room. Pilo was
4  there, and probably Laudas was there. Sometimes -- I think
5  Leonel was more of a hands-on-type guy. I don't think he had
6  that much to do with paperwork.
7      Q.  And in terms of this specific deal, did you go to
8  their office before you went to Mexico to bid; or was this all
9  over the phone?
10     A.  No. No. With -- the big deals, we went with -- it
11  was conferenced; and -- they had a conference room at their
12  office.
13     Q.  Okay. So, did you go to Parker to meet with them
14  before you ever went to Mexico to bid?
15     A.  No, I wouldn't have done that. I mean, I don't
16  remember exactly; but I wouldn't have done that because I
17  didn't know if I was going to buy it.
18     Q.  Okay. Well, tell me what you do remember doing.
19     A.  Well, just knowing following my -- my laundry list,
20  I would have went and looked at it. Went and made some calls,
21  make sure about what I can sell it for; and work backwards and
22  say, "I am going to make this much money." Find out what my
23  trucking was going to be. You know, you take something, if
24  you're going to sell it for $100, you start whittling off. I
25  want to make 20 percent, that puts me at $80. My trucking is

Page 73

1  $10. My brokerage fee is this much, Customs fee is this much.
2  And say okay, when -- you work backwards and say, "That's what
3  I am going to bid."
4      Q.  Do you make these calculations based on a truckload?
5      A.  No. You make your calculations on total cost, total
6  sales; and -- and you back out, you know, a truck is going to
7  cost me $1500, and I have got 21 truckloads.
8      Q.  After you inspected the pipe in Mexico, did you come
9  back to the United States and that's when you started this
10  laundry list and started determining who you were going to
11  hire to help you with different parts of the deal?
12     A.  Yeah. I don't remember if I drove or flew that
13  time, but I would have went to -- I made jillions of trips to
14  Parker's office.
15     Q.  About this particular pipe?
16     A.  This particular pipe would have only caused two
17  special trips.
18     Q.  And I was under the impression that you inspected
19  the pipe, and a few days later the auction -- or the bid
20  occurred. But it sounds like there is a lag time between when
21  you inspected it in Mexico and when you actually placed your
22  bid. Is that right?
23     A.  Yes. I mean, most of the time when they put the bid
24  out, they publicize the bid; and you have like two weeks to
25  actually turn your bid in. They give you, you know, a date

19 (Pages 70 to 73)

Page 82

1  Q.  What kind of information did you provide them about
2  the pipe?
3  A.  I would have give them a copy of the Bill of Sale,
4  probably from Franco, I was -- I'm sure.
5  Q.  And you would have a Bill of Sale even though you
6  hadn't purchased it yet?
7  A.  No, this is when we got ready to bring it across.
8  Q.  Okay. I thought we were talking about when you
9  first went to meet with Parker before you had ever bought it.
10  A.  Okay.
11  Q.  Okay?
12  So, at that point you wouldn't have a Bill of
13  Sale --
14  A.  No.
15  Q.  -- correct?
16  A.  No.
17  When we got ready to bring it across, I would have
18  had to have an invoice to give to the Mexican broker, which
19  would have forwarded it to the American broker.
20  Q.  Okay. You met with Parker, and then a few days
21  later you put your bid in and you got the pipe -- or purchased
22  the pipe, correct?
23  A.  Correct.
24  Q.  Okay. What happened next?
25  A.  We went ahead and brought it to the border, shipped

Page 83

1  it. You know, the last time I -- last time I seen it, it was
2  while it was in Cactus 43 yard --
3  Q.  Did --
4  A.  -- last time I seen it until I got on the American
5  side.
6  Q.  Did you have to meet with Parker again after you
7  purchased the pipe?
8  A.  I wouldn't have thought that there would have had to
9  have been a meeting for that. Everything would have been
10  done. I mean, it was routine by this point.
11  Q.  Okay. And now I do want to be clear about what kind
12  of information you provided Parker about the pipe. You said a
13  copy of the Bill of Sale?
14  A.  I am sure there would have been. I -- I don't have
15  it, but Parker should have a copy of it.
16  Q.  And what would the Bill of Sale have on it?
17  A.  Size.
18  Q.  Type of pipe?
19  A.  Should. I mean, I don't know what they have.
20  Q.  You don't remember one way --
21  A.  No.
22  Q.  -- or another?
23  Did you provide any pictures to Parker of the pipe?
24  A.  No.
25  Q.  Did --

Page 84

1  A.  I don't -- not that I remember.
2  Q.  Did you provide my other type of paperwork aside
3  from the Bill of Sale?
4  A.  Well, I would have told them in that meeting, you
5  know, the size of pipe it was, what it was, that it was
6  three-and-a-half, four-and-a-half, five-inch, whatever the
7  size was, drill pipe.
8  Q.  At the time that you had had this meeting with
9  Parker before you had put in the bid, did you talk to them at
10  all about the protest process with Customs?
11  A.  Before this happened?
12  Q.  Yes.
13  A.  I had no reason to.
14  Q.  Did they ever explain to you the process of filing a
15  protest?
16  A.  At this point?
17  Q.  Yes.
18  A.  No. I had never had any protests, any problems with
19  any of that, until shortly after this drill pipe hit; and then
20  we had two protest situations.
21  Q.  And before this -- the pipe ever came in, did you
22  have any discussions with Parker in any way in terms of the
23  protest process?
24  A.  Not that I can recollect.
25  Q.  Did anyone from Parker go to Mexico to see the pipe?

Page 85

1  A.  I have no idea. I mean, I cannot think of a
2  specific reason why they would have. If they had of, they
3  wouldn't have known what they were looking at.
4  Q.  Well, wouldn't you assume you would know if someone
5  from Parker had gone to inspect this pipe that you were
6  bringing into the country?
7  A.  The -- the way the system works, the runner that
8  runs -- they have a runner that runs paperwork back and forth
9  across the border. A Parker employee might have been across,
10  and seen it on the other side, but customarily there's no
11  reason for your broker to -- it's not his job to inspect it.
12  Q.  Okay. And you're not aware of Parker inspecting it?
13  A.  No. It -- they might have seen pipe on a truck.
14  They might have seen one load out of 20 loads. They might
15  have seen every load. I have no idea. They would have had no
16  special reason to have.
17  Q.  Okay. And as you sit here today, you're not aware
18  of them actually doing that?
19  A.  No.
20  Q.  Do you know if Parker ever contacted Frank Avila?
21  A.  It's possible. They probably never did. He would
22  have had to have some type of contact, or somebody would, with
23  the Mexican broker to have supplied the paperwork.
24  Q.  What do you mean, have had some type of contact with
25  the Mexican broker to have supplied the paperwork? Who?

22 (Pages 82 to 85)

Page 86

1    A.    Franco, Frank Avila, would have had to have supplied
2 a Bill of Sale.  That Bill of Sale first would have had to
3 have been presented to the broker on the Mexican side so he
4 can prepare the Mexican paperwork.  A copy also would have
5 been -- had to have been given to Parker.
6    Q.    Who was the broker on the Mexican side?  Do you
7 know?
8    A.    I have no idea.
9    Q.    Do you know if Parker ever contacted PEMEX?
10    A.    No.
11    Q.    Would they have any reason to?
12    A.    No.
13    Q.    So, to your knowledge, they would have to -- strike
14 that.
15          Parker would have to rely on you, then, to describe
16 the pipe to them, correct?
17    A.    Correct.
18    Q.    Did you complete any paperwork for Parker?
19    A.    Nothing on a formal basis.  I don't -- if we ever
20 did -- if it did, it would have been a handwritten deal; and
21 they would have typed it up and made it formal.
22    Q.    But you can't remember anything specifically?
23    A.    There's nothing in the process that would require
24 it.
25    Q.    How was the decision made to classify the pipe?

Page 87

1    A.    To classify it how?  Country of origin or size?
2    Q.    I mean classify it in terms of what classification
3 it's given for Customs purposes to be able to assess a duty or
4 to be able to determine there is no duty?
5    A.    Parker.  100 percent.  I mean.  That's their job.
6 That's what I hire them for.
7    Q.    Well, and I want to understand how the decision was
8 made, to your knowledge.
9    A.    They go and -- I think most of the time they make a
10 phone call.  They rely upon the Customs agent, just like you
11 would call the IRS to ask somebody.  And they would say, I'm
12 bringing -- or have a customer that's going to bring such and
13 such commodity across.  What are the duties?
14          And he said:  Okay.  That will fall under such and
15 such regulation.
16          Parker did or should have went and looked to make
17 sure that that's what -- you know, that -- you've got to
18 remember.  These are government regulations, and they're
19 written in government language.
20          So, one -- you know, like there is a copy in here of
21 one in here, and the regulation for -- to describe -- what's
22 the terminology -- a piece of equipment, it takes a page and a
23 half for them to describe what -- what this product is.
24    Q.    And when you say that Parker could have called
25 Customs or called someone to find out how to classify the

Page 88

1 pipe, is that something you know that happened; or you just
2 think that's a possibility?
3    A.    No.  They -- they -- I mean, I wasn't there and
4 witnessed the phone call; but that was the -- what they've
5 done.  I mean, I know they've done it on -- on both of the
6 pipe deals.
7    Q.    You know that they called somebody?
8    A.    Yes.
9    Q.    Who did they call?
10    A.    Somebody at Customs.  I mean, I don't -- the -- the
11 man that took care -- I don't know who they talked to; but
12 when all this hit the surface and come to -- to a head the
13 first time around, when it was all settled with Customs, his
14 name was Pete Martinez.
15    Q.    So, I want to make sure I understand what you're
16 saying.  Is it your understanding that somebody from Parker,
17 probably Pilo Walters, called Frank Martinez to say:  This is
18 the kind of pipe our client is importing.  How do we classify
19 it?
20    A.    That would have been very close to the procedure,
21 yes.
22    Q.    How would it be any different, if you know?
23    A.    Well, I don't know.  I mean, I am not -- I -- you
24 know, that's the general outline.  How else they do and what
25 they get in writing, et cetera, et cetera, I have no idea.  I

Page 89

1 mean, that's not my job.  But -- but I know they did call
2 and -- to check these out, because these were the specific
3 questions.
4    Q.    And in terms of Parker's ability to communicate or
5 ask the Customs agent what type of classification would be
6 placed on this pipe, they would have to base their discussion
7 on the description you gave them, correct?
8    A.    And -- and the invoice that was supplied to them.
9 But -- but, first, it would have been verbal, verbal or
10 written out on a piece of paper.
11    Q.    I don't understand what you mean.  What would be
12 verbal?
13    A.    I go to Parker and have a meeting.  I say:  Pilo, I
14 am bidding on this, this, and this.  Write it down on a piece
15 of paper, four-and-a-half-inch drill pipe.  Is there any
16 Customs duty on it?
17          He would have called and checked.
18    Q.    And what I want to make sure I am clear on is that
19 you were the one that would have provided the description to
20 Parker of the kind of pipe you were importing?
21    A.    Of course.  I mean, how else would he -- he know
22 what I am importing if I didn't tell him or -- or show him
23 something.  I don't know exactly what it was, which -- if it
24 was a piece of paper or if I wrote it down, if it was copied
25 from the bid sheet.

KATHY MILLER, CSR
NELL MCCALLUM & ASSOCIATES - HOUSTON, TX   (713) 861-0203

Page 90

1  Q.  And the pipe at issue in this lawsuit was classified
2  as waste and scrap pipe, correct?
3  A.  Not originally, no, ma'am.
4  Q.  How was it originally classified?
5  A.  As drill pipe.
6  Q.  Do you have any of the forms that would show that it
7  was originally classified as drill pipe?
8  A.  That's why I am getting invoices from Homeland
9  Security, because they still have it classified as drill pipe.
10  At that time, there were dumping duties on drill pipe.
11  Q.  Do you know what the actual number is on drill pipe
12  in terms of how it's classified in the tariff schedule?
13  A.  It changes all the time.  At that particular period
14  of time or that month or that year, there was a -- like a
15  30-something-percent duty; and Parker didn't catch that when
16  we brought it across, or we made the arrangements.
17       MS. HARDIN:  Object to the nonresponsive
18  portion.
19  Q.  (BY MS. HARDIN) So, my understanding is you had
20  this conversation with Parker.  You explained to Parker that
21  -- what kind of pipe you thought you were importing, which was
22  drill pipe?
23  A.  Uh-huh.
24  Q.  They -- your belief is they contacted someone at --
25  at Customs and then classified the pipe as drill pipe?

Page 91

1  A.  Yes, ma'am.
2  Q.  So, at the time, how they classified it would be
3  correct, based on what you told them you were importing,
4  correct?
5  A.  Yes, ma'am.
6  Q.  And if you didn't for some reason agree with the
7  classification, you would have told them, I assume, right?
8  A.  At that time, when -- when we were in the initial
9  stages of bringing it across, while all the paperwork was done
10  and they had prepared everything, yes, everybody thought we
11  was on the same page.
12  Q.  And as the importer of record, you're ultimately
13  responsible for how the pipe is classified, correct?
14  A.  I don't know.  I don't know how the -- the -- how
15  that's going -- you know, I don't know who makes that
16  decision.  I hired somebody to do -- well, never mind.
17  Q.  And is it your testimony that you believed at that
18  time that drill pipe from Mexico carried no duty?
19  A.  Yes.
20  Q.  And you said -- you had that belief based on a
21  conversation you had with whom?
22  A.  With Park -- with the Parker personnel.
23  Q.  Had you known that there would be duties on this
24  pipe, would that have changed what you did in any way?
25  A.  Yes.  We could have brought it in as made in United

Page 92

1  States because there was nothing to say that it wasn't.
2  Q.  Well, I thought that you said earlier that it -- you
3  didn't think there was a difference between saying it was made
4  in the United States versus made in Mexico.
5  A.  I didn't.  Parker told me there is no duty.  It
6  doesn't make any difference.  There is nothing proven where
7  it's made, bring it Mexican made.
8  Q.  Well, this wasn't the first time you had imported
9  goods from Mexico, was it?
10  A.  It was the first time I imported drill pipe.
11  Q.  The other equipment that you had imported from
12  Mexico before, were there duties placed on it?
13  A.  No.
14  Q.  There were not?
15  A.  No.
16  Q.  How --
17  A.  Unless this line pipe, the 180 loads, was before or
18  after.  I don't remember --
19  Q.  And there --
20  A.  -- if it was before or after it.  And it was like
21  one-half of 1 percent, or -- it was minimal.
22  Q.  How much did you pay Parker?
23  A.  When?
24  Q.  For the pipe that's at issue here.
25  A.  Those particular -- I don't -- I don't have the

Page 93

1  Parker invoices to know exactly.  The only thing I know is
2  about how much money I paid them over that two-year period.
3  Q.  What was your understanding of what you were paying
4  Parker for?
5  A.  To do all the paperwork, fill out all of the -- with
6  all the necessary agencies on the Mexican side and the
7  American side to import a commodity from another country.
8  Q.  Is there anything else that you thought was included
9  in the price you were paying them?
10  A.  Oh, I was paying them for a service to import.
11  Q.  Did you think if there was a future protest that
12  somehow you were paying them to take care of that as well?
13  A.  Yes.  I would consider that -- yes.
14  Q.  Based on what?
15  A.  Well, in this particular instance, they failed me
16  drastically in informing me up front.  And when it first come
17  to be an issue back in, I believe, '97, I went to Parker's
18  office and had a meeting with Pilo Walters about where the
19  U.S. Customs was pursuing the dumping fee.
20       Pilo Walters told me:  Rex, you know, here's the
21  situation.  It looks better if you go down there yourself,
22  represent yourself, go talk to them, explain to them what
23  happened and, you know, just take care of it.
24       This is where I am getting to protest.  It was not a
25  formal protest like you go through a motion and hire an

24 (Pages 90 to 93)

Page 98

1  24- and 36-inch line pipe I brought across.
2    Q.   So, this has to do with the pipe -- the 180 --
3    A.   180 -- yes, ma'am.
4    Q.   -- truckloads --
5    A.   Yes, ma'am.
6    Q.   -- of pipe?
7    A.   Yes, ma'am.
8    Q.   And I thought that that was line pipe, not scrap and
9  waste pipe.
10   A.   But the classification -- it was line pipe; but it
11 was so deteriorated, it was extremely rusty. It was line
12 pipe. This is the classification they brought it in under.
13 Customs went and changed that classification by changing a
14 word; and that's where I spent the $3800, I believe, on the
15 third -- on the 180-something loads.
16   Q.   Because some of that pipe was changed or
17 reclassified from scrap and waste to line pipe?
18   A.   Some -- something similar to that. Even -- it
19 was -- it was all debatable. When this stuff comes across and
20 it's used, it's a -- you know, Parker tells them what it is;
21 and this is -- you know, they say: This is what you classify
22 it as.
23       That's all I know. And, see, here, Leonel took care
24 of this.
25   Q.   Okay. And is this a form that you would have

Page 99

1  received from Parker? I see your name in the address field.
2  That's why I am asking.
3    A.   Yeah. No, this is just an invoice for me to pay the
4  bill.
5    Q.   Okay. And do you receive an invoice like this --
6    A.   Here. Look on the back page. You see?
7    Q.   Okay. Let --
8    A.   Here is what it is.
9    Q.   Hold on. Let me finish my question.
10       Do you receive an invoice like this on any load that
11 you're bringing into the country through Parker?
12   A.   Yes. I would have received a -- a bill like this
13 from Parker on every -- on every load.
14   Q.   Okay. So, would you have bills like this from
15 Parker on the loads that are at issue in this lawsuit?
16   A.   Maybe. I don't know. I -- I honestly don't know.
17 I don't know if I got them or not. Evidently I don't have
18 them, or I would have produced the ones for drill pipe when --
19 when I give these to -- to my attorneys. I think this was
20 just sent in as a sample of the way that -- the paper process.
21 But this is not the pipe at issue. See, this is -- this is
22 36- and 24-inch line pipe.
23   Q.   Okay. I am going to hand you what we will mark as
24 deposition Exhibit 5 and give you a minute to look at that
25 document.

Page 100

1       (Exhibit 5 marked.)
2    A.   (Witness reviewing document.)
3       Same thing. Same thing as this one (indicating),
4  just Parker typed it up different.
5    Q.   (BY MS. HARDIN) Well, actually, on the second page,
6  it describes the pipe as line pipe.
7    A.   Uh-huh.
8    Q.   So, it -- would this invoice relate to the pipe at
9  issue in this lawsuit?
10   A.   No, ma'am. No, ma'am.
11   Q.   Why not? How do you know that?
12   A.   Turn to this page right here (indicating). This is
13 36-inch and 24-inch line pipe.
14   Q.   Okay.
15   A.   The -- the pipe at issue here is drill pipe.
16   Q.   Okay. So, how would it be described on this page,
17 on the page we're looking at, which is titled "Frano" at the
18 top?
19   A.   I don't understand your question.
20   Q.   Well, I -- how do you look at this and know that
21 this is not the pipe at issue? Because of the length?
22   A.   No, ma'am. It has the size right there --
23   Q.   Okay.
24   A.   -- 36-inch, 24-inch.
25   Q.   So, you know this is line pipe?

Page 101

1    A.   Plus, they are class -- "clasificado como chatarra,"
2  classified as scrap. Right there in Spanish.
3    Q.   Okay. So --
4    A.   It says: Line pipe carbon steel. Classification:
5  Chatarra. That's what the brokers look at it and classified
6  it as. Here is the size, et cetera.
7    Q.   Okay. Explain something to me. If I look at that
8  page you're looking at on Deposition Exhibit 5 --
9    A.   This page here?
10   Q.   Yes.
11   A.   Yes, ma'am.
12   Q.   -- it appears to be the exact same as deposition --
13 as Exhibit 4.
14   A.   Yes, ma'am. As far as the back page, yes.
15   Q.   And, yet, on Deposition Exhibit 4, it's listed as
16 scrap; and on Deposition Exhibit 5, it's listed as line pipe?
17   A.   Both of -- both of the Mexican invoices say scrap.
18   Q.   Right. But I am talking about the page before
19 that's the entry summary from Customs. On one of them it says
20 scrap and waste, and on one it says line pipe.
21   A.   Okay. A different person typed it up.
22   Q.   Who would have typed it up?
23   A.   I have no idea. I don't know if this is done by
24 Parker or if it's done by the Government. I have no idea.
25   Q.   Well, do you approve what classification is given to

26 (Pages 98 to 101)

Page 102

1  the particular goods before the information is turned over to
2  Customs?
3      A.    Parker imported this stuff. They told me what
4  the -- the fees were, or -- this particular one -- let me see
5  if I can make some sense out of this.
6          6-17. This one was 4-19. Okay. I don't know. I
7  mean, it's typed up on two -- this one looks like it's a hand
8  typed list, and this one looks like it's computer generated.
9      Q.    But why would there be two different classifications
10  for pipe that is described exactly the same way?
11      A.    I have no idea. I didn't -- I didn't fill the
12  paperwork out.
13      Q.    Okay. And is it your testimony that you don't have
14  any similar invoices from Parker regarding the pipe at issue?
15      A.    I don't think so, or I would have already -- or I
16  would have -- when I started putting all my files together, I
17  would have thought, you know, of holding it up. I mean, I'll
18  look; but, as far as I know, I don't.
19      Q.    Okay. Because I -- did you see the request for
20  production we sent to you back in March?
21      A.    Yes, ma'am.
22      Q.    Okay. And the only documents I got in response to
23  that were these invoices, and it sounds like what you're
24  telling me is these invoices don't even have anything to do
25  with the pipe at issue in this lawsuit?

Page 103

1      A.    I believe all the stuff was furnished to you-all
2  even before we ever even filed the lawsuit, probably, when I
3  brought them all over to you.
4          Let me see the other ones you have right -- from --
5  from -- from Franco. Do any -- what are the rest of them?
6  Are they line pipe, or are they drill pipe? Is there drill
7  pipe in there? I have drill pipe. I don't know.
8      Q.    Everything that I have seen says either waste and
9  scrap or line pipe.
10      A.    Or line pipe? Okay. That is not the pipe at issue.
11          MR. THOMPSON: Let's take one minute, if you
12  don't mind.
13          MS. HARDIN: Okay.
14          (A break was taken, 12:09 to 12:15 p.m.)
15      Q.    (BY MS. HARDIN) When we took a break, we were
16  talking about the -- Exhibit 4 and Exhibit 5, which appear to
17  be invoices from Parker; but I understand from your testimony,
18  these invoices are not -- do not pertain to the pipe at issue
19  in this lawsuit, correct?
20      A.    No, ma'am, they do not.
21      Q.    And I will hand you -- we will mark these as
22  Exhibits 6 and 7, and just confirm with you that neither of
23  these invoices relate to this lawsuit as well?
24          (Exhibits 6 and 7 marked.)
25      A.    (Witness reviewing document.)

Page 104

1          THE WITNESS: Two -- I think it's this number
2  here (indicating) would have to match one of these numbers
3  here. See if that number matches any of them.
4          MR. THOMPSON: What, now?
5          THE WITNESS: See if this number
6  (indicating) here, entry number, matches any of these entry
7  numbers. No. This is the Government number.
8          MR. THOMPSON: Well, she doesn't even know
9  what you're looking at, Rex; so, why don't you just -- why
10  don't you just answer her question?
11          THE WITNESS: Well, I am looking to see if it
12  is.
13      Q.    (BY MS. HARDIN) Okay.
14      A.    It has a similar description to the pipe at issue
15  here --
16      Q.    Okay.
17      A.    -- but I am looking to see if the entry number --
18      Q.    Okay.
19      A.    -- the Government entry number is actually one of
20  these --
21      Q.    Okay.
22      A.    -- that's at issue.
23      Q.    And the document that you're looking at that you're
24  comparing the invoice to would be lists of the Government
25  numbers regarding pipe at issue?

Page 105

1      A.    That's what I am trying to see, if it's on here.
2      Q.    Right.
3          And we will go ahead and mark that as a deposition
4  exhibit when you're finished looking at it.
5          MR. THOMPSON: That's one of the documents
6  that has been produced to you today.
7          MS. HARDIN: Right.
8          THE WITNESS: This one.
9          MS. HARDIN: This would be much shorter had I
10  gotten all of these documents before. I am just telling
11  you-all.
12          MR. THOMPSON: Isn't that the way it always
13  is.
14      A.    Thirty-nine -- if I am reading this correct, this --
15  this one here (indicating) is not at issue. The entry number
16  here does not match an entry number that the Government has
17  told me that I owe duty on.
18      Q.    (BY MS. HARDIN) Okay. What makes -- what first
19  made you think it possibly could be?
20      A.    It had a similar description.
21      Q.    Okay. What is the description that it has that's
22  similar?
23      A.    Three-and-a-half-inch tubing for perforation.
24      Q.    And what is the entry number on the one that you are
25  looking at?

27 (Pages 102 to 105)

Page 110

1    Q.   And you brought this pipe in before the pipe at
2  issue, is what I have understood from your testimony before?
3    A.   I am not sure if it was before or after or during.
4  It was in this -- close -- same time period. We just have to
5  go back and look at dates. I couldn't -- I am not sure.
6    Q.   Okay.
7    A.   And I haven't pulled anything to rattle my head to
8  know, either. It was all within a six-month period.
9    Q.   And the only reason I am asking these questions and
10 I am confused is that you said earlier that Parker told you,
11 "We need to start listing things or identifying things as
12 manufactured in Mexico"; and it seems to me that you had been
13 doing that. So --
14   A.   No --
15   Q.   -- that's what I am confused about.
16   A.   -- not on all of the -- the prior loads before this
17 pipe deal -- these two pipe deals. Everything -- 90 --
18 probably -- I don't know. I have to go back and look -- 99
19 percent of it was made in United States.
20   Q.   Okay. But I understood your testimony to be before
21 this 180 truckloads that were deemed from Mexico, and before
22 the pipe at issue, you hadn't done that much importing from
23 Mexico through Parker?
24   A.   Wait. I am a little confused.
25       I don't think I ever said, and if I did, I don't

Page 111

1  believe I did, that -- I don't know -- I don't know which come
2  first, whether it was this pipe or the other pipe.
3    Q.   Okay.
4    A.   I mean, it's very easy to prove. All we have got to
5  do is look at invoices when we find the correct ones.
6    Q.   Well, I would assume you wouldn't have agreed with
7  Parker that you needed to identify the pipe at issue in this
8  case as made in Mexico if you had been importing a ton of pipe
9  from Mexico?
10   A.   I would -- I would agree with that.
11   Q.   Okay.
12   A.   I mean, I don't know the dates.
13   Q.   Okay. We will just have to look at the records?
14   A.   Yeah.
15   Q.   Anytime you bring goods in -- strike that.
16       The pipe at issue, did you have to hire an insurance
17 company to bond you or to insure you in terms of bringing this
18 pipe into the United States?
19   A.   Anytime you use an import/export broker, that's the
20 first thing you do before you do any business, is you give
21 them power of attorney to buy that insurance.
22   Q.   So, it's actually the broker that buys the
23 insurance, not you?
24   A.   They arrange it. You pay for it; they arrange it,
25 send you a bill for it.

Page 112

1    Q.   Do you get to decide which insurance company you're
2  going to use?
3    A.   No, ma'am.
4    Q.   Who was hired in this case? And is it insurance or
5  a bond, or how does that work?
6    A.   I think it's a bond. If I said insurance -- I mean,
7  they're saying their name is XL Insurance, but it's a bond.
8    Q.   And my understanding is that you typically buy a
9  bond in an amount equal to two times what the expected duty
10 would be. Does that sound right to you?
11   A.   I don't know. I leave that up to the -- all I do is
12 sign a power of attorney, and they go buy it.
13   Q.   So, you don't participate in buying the bond in any
14 way?
15   A.   Nothing except giving them power of attorney to do
16 it on my behalf.
17   Q.   And what is your understanding of the agreement with
18 the insurance company in terms of if you don't pay a duty?
19   A.   The Government will force them to forfeit their
20 bond, and then they come back after me -- or, you know, after
21 the -- the client.
22   Q.   Did they pay the duties in this case?
23   A.   I don't know if they have paid it. They have been
24 asked to pay it.
25   Q.   So, you haven't actually paid out any money to

Page 113

1  Customs, have you --
2    A.   No.
3    Q.   -- about the pipe at issue?
4    A.   No, ma'am.
5    Q.   So, at this point in time, you're not out-of-pocket
6  any money yet, are you?
7    A.   No. I've just got a stack of invoices that come
8  once a month, hit me up for 70-something-thousand-dollars.
9    Q.   From this insurance company?
10   A.   No, from the Government.
11   Q.   Okay. But, at this point, you haven't paid
12 anything?
13   A.   No, ma'am.
14   Q.   Will you please send us all of these invoices you
15 keep getting every month? Because we haven't seen any of
16 them.
17   A.   Parker has copies of all of them, and I -- they all
18 look the same.
19   Q.   Okay. Well, Parker isn't getting monthly invoices
20 from the Government.
21   A.   No --
22   Q.   Okay.
23   A.   -- but I give them a copy of the first ones that I
24 received.
25   Q.   Okay. But no one has given us, or Parker, copies of

29 (Pages 110 to 113)

KATHY MILLER, CSR
NELL MCCALLUM & ASSOCIATES - HOUSTON, TX  (713) 861-0203

Page 114

1  what you have received. And I don't know how long this has
2  been going on, but the past year I --
3       A.   Parker got a copy of them, and they're all the same.
4  I guess they keep adding interest to them, but they all --
5  everything is the same except for interest adding, when I give
6  them a copy last February or March, whenever I was at their
7  office.
8       Q.   And you would agree with me that if you paid the
9  amount now, the -- there wouldn't be interest continuing to
10  accrue, correct?
11      A.   Yeah, I think that's right. Yes, ma'am.
12      Q.   So, every month, you're charged more and more money
13  because you haven't paid the duties on the pipe at issue in
14  this case?
15      A.   Yes, ma'am, that's what I understand.
16      Q.   And based on the fact that you keep getting these
17  invoices, does that tell you that the bond company has not
18  paid these duties either?
19      A.   Yes, ma'am.
20      Q.   And are you getting correspondence from them?
21      A.   I -- I think I have only got two correspondences
22  from them. Oh, that's got a date on it. And I think there is
23  only two. God, I can't read the date of that. This has
24  January 20th of '04. This must have been the second one. I
25  think there is another one there should be a copy of or you

Page 115

1  have a copy of or something.
2       Q.   No, I don't. We will have to mark that as an
3  exhibit to your deposition as well.
4       A.   Okay. It's a past due deal from the bond company.
5       Q.   Do you want us to copy it so you can keep the
6  original, or how do you want to handle that?
7       MR. THOMPSON:  Let's do it that way.
8       THE WITNESS:  Yeah.
9       MS. HARDIN:  Before we leave, I just want to
10  make sure we get copies of everything we need.
11       So, the insurance letter will be marked as
12  Deposition Exhibit 8.
13       THE WITNESS:  Okay. Just make a pile, I
14  guess, put that stuff in.
15       MR. THOMPSON:  Okay.
16       (Exhibit 8 marked.)
17      Q.   (BY MS. HARDIN)  Have you had any conversations with
18  the insurance company?
19      A.   I talked to this girl, I think once, just to tell
20  her what I was doing, that I was going to take legal
21  procedures; and that was it.
22       (Alarm going off.)
23       MS. HARDIN:  I guess we will be breaking for a
24  fire drill.
25       (A break was taken, 12:31 to 12:32 p.m.)

Page 116

1       Q.   (BY MS. HARDIN)  Can you identify for us the name of
2  this insurance company?
3       A.   XL Insurance Surety.
4       Q.   And can you identify for us the name of the woman
5  you said you spoke to there?
6       A.   Christine Bilotta, or Bilotta, B I L O T T A.
7       Q.   How many times have you spoken with Ms. Bilotta?
8       A.   I think once.
9       Q.   When was that?
10      A.   It would have been sometime shortly after the first
11  notice.
12      Q.   Which would have been February of 2003 --
13      A.   Correct.
14      Q.   -- correct?
15      A.   Correct. Somewhere in that -- I am sure they
16  notified them the same time that they notified me.
17      Q.   And have you spoken to anyone else at the insurance
18  company?
19      A.   No, ma'am.
20      Q.   And you have only spoken to her on that one
21  occasion?
22      A.   I believe once, maybe twice, but I believe once.
23      Q.   And what do you remember telling her?
24      A.   She just asked me what I was going to do about it,
25  and I said I was taking legal proceedings.

Page 117

1       Q.   Anything else you remember about the conversation?
2       A.   (Witness moving head side to side.)
3       Q.   Okay. Tell me what happened when you first received
4  this pipe that's at issue in this lawsuit. How did -- how did
5  that transpire?
6       A.   When I first received it?
7       Q.   Yeah. In terms of -- walk me through it a little
8  bit in terms of who the trucking company was and what took
9  place.
10      A.   After we got it all to the United States side, took
11  it down to look at it and found out that it wasn't even the
12  pipe that I bought in Mexico. It wasn't even the white band
13  pipe that I had inspected.
14      Q.   How many truckloads were there?
15      A.   Twenty-something truckloads, 20, 21, whatever.
16      Q.   And they were all there at roughly the same time?
17      A.   Yeah, within that one-week, two-week period.
18      Q.   And where did you have to go to look at the pipe?
19      A.   There at the border at whichever trucking company I
20  was using.
21      Q.   Do you remember which company it was?
22      A.   I think it was Cowart. Cowart. Cowart.
23      Q.   What made you go down to the border to look at the
24  pipe? Would you normally do that?
25      A.   Hmm, yeah, to segregate it, to separate it.

30 (Pages 114 to 117)

Page 118

1    See, they bring it across on Mexican trucks and then
2 unload it, put it on the ground. You have to go back and put
3 this on this truck and that on that truck.
4    Q.   So, do you use a different trucking company in the
5 United States versus what is used in Mexico to transport the
6 pipe to the border?
7    A.   The Mexican truck usually brings it across, and then
8 they unload it. This was preNAFTA days. And -- well, even
9 still today, you know, the stuff -- they usually just bring
10 the Mexican truck across the first couple miles.
11   Q.   And you -- is it always the case that you go meet
12 the pipe and inspect it?
13   A.   Ninety-nine percent of the time, yes, you would
14 have, if it was a mixed load. If it was just one single load
15 going to one place, you know, it wouldn't be necessary.
16   Q.   And just so we're clear for the record, you would
17 agree with me that Parker classified the pipe you originally
18 purchased based on your description; and their original
19 classification was correct?
20   A.   That's -- yes, ma'am. I am not saying at that point
21 that they didn't do their job at that point. No. They done
22 what -- they done, at that point, everything they were paid to
23 do except for researching far enough on this drill pipe.
24   Q.   So, what happens next? You go inspect the pipe
25 and --

Page 119

1    A.   Find out it's not even what the -- Avila had
2 switched it on me, sold it to somebody else, and -- and
3 supplied junk pipe and put it into the load and loaded the
4 trucks in Mexico.
5    Q.   How did you find out what had actually happened?
6    A.   It was obvious. Just go up and look at it, and you
7 see it's not the pipe you bought. It wasn't even inspected
8 pipe. It was junk pipe.
9    Q.   And did you call Frank Avila?
10   A.   That's about the time he disappeared.
11   Q.   So, you haven't been able to contact him?
12   A.   No. No, ma'am.
13   Q.   What did you do when you went and saw that the pipe
14 was bad? What did you do with the pipe?
15   A.   Sold some of it as scrap, sent some of it to an
16 auction, just got -- just got rid of it the best way I could.
17   Q.   Okay. And I am not talking about -- I mean those
18 few days when you go see it and you realize that it's not the
19 pipe you ordered.
20   A.   Just try to recover as much as you can.
21   Q.   Well, did you report it to anybody? Did you call
22 the police?
23   A.   No. There is -- there is -- this is very common on
24 the border deal, because there are so many people in Mexico
25 crooked; and it's just a risk you have to take to do business

Page 120

1 down there. A lot of people won't even go down there because
2 of these type risks.
3    Q.   Is the pipe packaged in any way when it's
4 transported, or is it just a bunch of pipe in a truck?
5    A.   Yes, ma'am, it's just a bunch of pipe stacked on a
6 truck.
7    Q.   Did the pipe actually look damaged to you in any
8 way?
9    A.   The pipe I actually got?
10   Q.   Yes.
11   A.   It looked very, very wore out. I mean, it's obvious
12 to anybody that knows drill pipe -- well, first thing, we
13 walked up, and it's not white band pipe. It's structural, or
14 it's got -- it's red -- you know, it's not your pipe. It's
15 not double white band. It's got red -- red on it, or
16 whatever.
17   Q.   Did all of the pipe at issue in this case have red
18 bands on it?
19   A.   I couldn't swear. All I know is, it wasn't -- it
20 wasn't the double white band I had bought at all.
21   Q.   And I understand it wasn't the pipe you purchased,
22 but I want to understand what kind of pipe it actually was.
23   A.   It was all structural pipe. Everything I got was
24 structural pipe. To clarify structural pipe, it was not
25 usable to be -- for its original intent.

Page 121

1    Q.   But it was usable to build structures?
2    A.   Yes, ma'am.
3    Q.   So, you tried to contact Frank Avila and couldn't
4 find him?
5    A.   He's gone.
6    Q.   Did you call Parker and tell them what happened?
7    A.   Yeah.
8    Q.   Who did you talk to?
9    A.   I am sure Pilo.
10   Q.   You're sure, or you're not really?
11   A.   Well, if it wasn't Pilo, it would have been Laudas,
12 or one of them. But I had no recourse against them. It
13 wasn't their fault.
14   Q.   It wasn't their fault that the wrong pipe was
15 delivered to you?
16   A.   No, it wasn't their fault. I am not claiming that.
17   Q.   And you think that the drill pipe that you purchased
18 was switched to structural pipe somewhere in Mexico, I assume?
19   A.   Yes. Uh-huh.
20   Q.   It didn't happen in the United States?
21   A.   No, ma'am.
22   Q.   Or while it was in the custody of Customs?
23   A.   No. Or in Parker's custody, no.
24   Q.   Did you write any letters to anybody saying, "This
25 is ridiculous. Something needs to change," or --

31 (Pages 118 to 121)

Page 122

1   A.   I did whenever -- I mean, I was taking -- I am a big
2   boy, and that's part of business.  You don't win on every
3   deal.
4   Q.   This is just a risk you accept in doing business in
5   Mexico?
6   A.   That's right.
7   Q.   Did you --
8   A.   Of the pipe getting switched, yes, ma'am.
9   Q.   Did you write a letter to Customs to say:  This pipe
10  that I received is effectively improperly classified because I
11  actually received structural pipe?
12  A.   At that time there was no -- no duty.  There was no
13  reason for me to, until a few months later whenever Customs
14  notified me that they -- that -- that it had been -- the best
15  I remember, that it -- it wasn't that it was reclassified, is
16  that there was a dumping duty on it.
17  Q.   And before I get to that point, I just want to be
18  clear:  When you first identified or found out that you had
19  imported the wrong pipe, did you contact Customs in any way?
20  A.   No.  There was no reason to.
21  Q.   Did you do anything to get your money back, or was
22  there not any way you -- or nothing you could do?
23  A.   Not unless you're going to go to jail for killing
24  somebody.
25  Q.   And although this pipe was structural pipe, it was

Page 123

1   still steel alloy pipe?
2   A.   Yes.
3   Q.   Was it the right amount of pipe that you thought you
4   were buying?
5   A.   A right amount of truckloads.
6   Q.   And would you be able to say whether -- "I was
7   supposed to get 500 pieces of pipe, and I got 400"; or do you
8   not know that one way or another?
9   A.   Well, depending on the diameter of the pipe, how
10  many pieces of pipe you can put on a truck --
11  Q.   Did you --
12  A.   -- legally per weight.
13  Q.   Did you get any kind of paperwork identifying what
14  kind of pipe you actually brought into the country?
15  A.   I would have got something when I went and picked
16  the invoice up from Parker, you know, like these (indicating).
17  Q.   Okay.  You mean like Deposition Exhibit 7 --
18  A.   (Witness moving head up and down.)
19  Q.   -- the page that you have from -- it looks like
20  Frano at the top?
21  A.   Uh-huh.  I would have -- I would have gotten this
22  from Parker.  I wouldn't have got it from Frano originally.
23  This is the paperwork he picked -- that he prepared to take
24  care of everything on the Mexican side.
25  Q.   Why would Parker have that paperwork if --

Page 124

1   A.   It's part of the paper process, the paper trail.  It
2   starts out on -- with Mexican broker; then the U.S. sends
3   their runner over to pick up the Mexican broker's paperwork,
4   and then they come back and prepare for the entry on this
5   side.
6   Q.   Well, do you think that the Mexican companies would
7   have sent to Parker documents that identify that you were
8   buying the wrong pipe?
9   A.   To the untrained eye, it all looks the same.  I
10  mean, this isn't -- has -- has nothing to do with me exerting
11  that the brokers knew that it had been switched.
12  Q.   I understand.
13  A.   It would have taken an expert to have known that, or
14  even myself to have known that it was pipe I bought.  I mean,
15  none of the paperwork says -- when it come to the border that
16  says this all must be this size, double white band.
17  Q.   Right.
18  A.   It's just classified as drill pipe.
19  Q.   Do you have any paperwork that would actually show
20  what kind of pipe you actually brought into the country?
21  A.   The paperwork -- only thing I would have is what
22  Parker supplies me with.
23  Q.   When I am asking is if you have --
24  A.   It would be a --
25  Q.   -- anything in your possession.

Page 125

1   A.   Not that I'm aware of.
2   Q.   Do you have any pictures of the pipe that you
3   brought into the country?
4   A.   No, ma'am.
5   Q.   So, do you have any way that you can think of that
6   you can identify for us what type of pipe it was, aside from
7   your testimony that it was structural pipe?
8   A.   I have where I went and sold it.
9   Q.   Okay.  And aside from the documents that show where
10  you sold it, do you have anything else that would make us be
11  able to identify exactly the type of pipe you brought into the
12  country?
13  A.   No.  I guess you can call me a liar, then.
14  Q.   I am not saying that.
15  A.   Yeah.
16  Q.   I am trying to understand what evidence you have.
17      Did Customs --
18  A.   I --
19  Q.   Go ahead.
20  A.   -- I mean, I have the -- there's -- there's no
21  serial numbers or traceability on it.  I mean, you're talking
22  about truckloads of pipe.  And it's just like a truckload of
23  toothpicks, you can't identify them.
24  Q.   So, my understanding is that on July 15th, 1996, you
25  sold some of this pipe at auction, correct?

32 (Pages 122 to 125)

Page 126

1    A.    Yeah, whatever the -- the date on it, there was,
2    yes, ma'am.
3    Q.    And my understanding is, this pipe first came in the
4    country in April. Would that be right?
5    A.    Something like that.
6    Q.    What did you do with the pipe for those three
7    months?
8    A.    Brought it and -- most of these auctions are set up
9    months and months in advance, and you take it and just go set
10   it on the rack over there and set and wait for the auction
11   date.
12   Q.    So, the auction house stores the pipe for you?
13   A.    Uh-huh.
14   Q.    And when you first inspected this pipe and found out
15   that it was the wrong pipe and you wanted to sell it as
16   structural pipe, did you immediately ship it to Superior?
17   A.    I don't know if I immediately or if I left it
18   sitting in Hidalgo or Pharr, whichever port it was sitting
19   down there, if I left it sitting there for a month or two
20   before I could ship it up there. Depending on how the auction
21   was set up.
22   Q.    You just don't remember one way or the other?
23   A.    No, ma'am.
24   Q.    Do you know to whom you sold the pipe?
25   A.    I have no idea.

Page 127

1    Q.    Okay. So, what happens with the auction process?
2    Give me a very brief explanation.
3    A.    You take it, consign it to them. They set it on
4    pipe racks out there. It's open for open viewing. Then
5    most -- most of the auctions are taking place, they take a --
6    separate everything in lots. They take a photo of it and then
7    go back to a -- to a large hotel to a conference room and have
8    a slide show projection sale and sell it to high bidder.
9    Q.    Were you at the auction when the pipe was sold?
10   A.    No, ma'am.
11   Q.    So, you just get a check from Superior, essentially?
12   A.    Less their commission.
13   Q.    How much was the check that you received?
14   A.    I don't remember. It was something somewhere that
15   tells how much it was. I think there is a copy of the deposit
16   slip.
17   Q.    I can probably short-circuit you on that.
18        MS. HARDIN:  Let's go ahead and mark this as
19   deposition Exhibit 9.
20        (Exhibit 9 marked.)
21        MR. THOMPSON:  Can we go off the record a
22   second?
23        (A break was taken, 12:45 to 12:49 p.m.)
24   Q.    (BY MS. HARDIN) We took a very brief break, and I
25   was asking you how much you sold the pipe for at auction.

Page 128

1    A.    I found a copy of the deposit slip. It was
2    $34,361.77.
3    Q.    And how much of a commission did Superior take?
4    A.    I don't know. Probably six percent.
5    Q.    So, you probably sold it for something closer to
6    37,000?
7    A.    Yeah, something like that.
8    Q.    And, obviously, because you sold the pipe at issue,
9    you didn't destroy it, correct?
10   A.    No.
11   Q.    And you didn't send it back to Mexico?
12   A.    No. There is no recourse for that.
13   Q.    If all of the pipe at issue in this case was --
14   strike that.
15        Was all of the pipe at issue in this case sold at
16   the Superior auction?
17   A.    No, I don't believe so. I don't -- part of it --
18   well, part of it was sold as scrap, which at the time was very
19   high, as -- on a per-ton basis.
20   Q.    What do you mean, it was very high?
21   A.    Scrap was very high; so, there wasn't a lot of
22   difference, if you sold some of it as scrap, as if you sold it
23   for -- to make cattle guards out of. If the price is the
24   same, you don't care what the other people do with it.
25   Q.    So, you didn't do any investigation in terms of

Page 129

1    identifying for what use the people who were purchasing your
2    pipe were going to put it to?
3    A.    No. It's not my business. No. I mean -- you know,
4    it -- it was in such a deteriorated state that, you know, it's
5    obvious -- it's obvious that's what it was.
6        MS. HARDIN:  Object to the nonresponsive
7    portion.
8    Q.    (BY MS. HARDIN) And if I understand your testimony
9    correctly, you can't tell us today how much of the pipe you
10   sold to Superior versus selling to someone else?
11   A.    Exactly to the foot, no. I could tell you roughly
12   how much it was.
13   Q.    Okay. Tell me roughly.
14   A.    It probably should have brought somewhere around
15   $1.25 a foot.
16   Q.    Okay.
17   A.    So, just take those numbers and divide.
18   Q.    And I don't understand what you're saying, then. I
19   am trying to find out how much you sold at Superior versus
20   somewhere else. Can you give me a percentage or --
21   A.    Take the -- take the 30-something-thousand
22   dollars --
23   Q.    Right.
24   A.    -- take the $34,000, $35,000, and divide it by
25   $1.25; and that will tell you how many feet I sold.

33 (Pages 126 to 129)

Page 130

1    Q.   Okay. What was the total feet that came into the
2    country?
3    A.   We would have to reverse that, too. We brought in,
4    what, 20 -- 20 -- 20-something truckloads. Each truck would
5    have had roughly 100 joints on it. And we'd just have to do
6    the reverse math.
7    Q.   Can you give me just an estimate doing the math?
8    A.   I'd have to have a piece of paper and pen and figure
9    it out.
10   Q.   Okay. We will come back to that.
11   A.   I mean, just -- all we've got to do is the math.
12   Q.   Okay. How many feet are typically in a truckload?
13   A.   Should have three -- basically around 3,000 feet.
14   100 joints. So, 3,000 times 20-something loads.
15   Q.   And aside from selling the pipe at issue at Superior
16   auction, where else would you have sold it?
17   A.   I think I sold -- I think I actually scrapped some
18   of it.
19   Q.   Anything else?
20   A.   I mean, if -- if -- you know, I am not saying --
21   don't get me wrong here. If I sold it as scrap, I got as much
22   for it as if I was going to sell it for -- in an auction.
23   Q.   I understand.
24   A.   I wouldn't have taken any less. But if I could get
25   as much for it by them cutting it up in little pieces as I

Page 131

1    could for somebody using it for structural, I would have done
2    that, too.
3    Q.   And the pipe that you sold for scrap, you don't know
4    what use that company put it to either, correct?
5    A.   He might have resold it for structural. He might
6    have cut it up and put it in the junk bin.
7    Q.   You just don't know one way or the other?
8    A.   It's not for me -- I could care less.
9    Q.   Do you know if Superior sent any documentation to
10   Customs?
11   A.   They sent a letter to Customs.
12   Q.   I understand that. But before the letter, did
13   they -- would they send any documentation once they sold pipe
14   for you?
15   A.   No, ma'am. They have no reason to.
16   Q.   So, there is no obligation for them to report to
17   Customs, "We just sold some imported pipe"?
18   A.   No, ma'am, not in this type situation. No.
19   Q.   I want to hand you a few documents that I'll go
20   ahead and mark.
21        MS. HARDIN: Let's mark all of these.
22        (Exhibits 10 through 18 marked.)
23   Q.   (BY MS. HARDIN) Okay. I am handing you what's been
24   marked as deposition Exhibits 10 through 18, and I'll give you
25   some time to flip through those.

Page 132

1    A.   (Witness reviewing document.)
2         Yes, ma'am, I have looked at them.
3    Q.   Let's start with Deposition Exhibit 10. Can you
4    identify this document for us?
5    A.   It says it's a notice of action where they've
6    changed the duty rate on some -- it says line pipe.
7    Q.   And the date on the top of this notice is December
8    1996?
9    A.   December 4th, yes.
10   Q.   And it's signed at the bottom by Pedro Martinez --
11   A.   Yes.
12   Q.   -- who would be the Customs officer you have
13   mentioned before?
14   A.   Yes, ma'am.
15   Q.   And my understanding from this document is it's
16   changing pipe from being classified as waste or scrap to being
17   classified as line pipe, or a different kind of pipe; is that
18   correct?
19   A.   Yes, ma'am.
20   Q.   Does Exhibit Number 10 have anything to do with the
21   pipe at issue in this lawsuit?
22   A.   No, ma'am.
23   Q.   Can you describe for us what Deposition Exhibit 11
24   is?
25   A.   Seven -- it appears to be a related

Page 133

1    Government-generated document that goes along with -- 10, 11,
2    12, are all -- all the line pipe that's -- pipe that's not of
3    issue.
4    Q.   Okay. And my understanding from you before is that
5    there was some question about classification of this line
6    pipe, and that's what these documents pertain to?
7    A.   I believe -- I believe the answer is yes, if I
8    understand what you're saying, that -- all of these -- as far
9    as I can tell, all of these documents right here are related
10   to where they changed the duty from zero to 1.5 percent of
11   invoice value.
12   Q.   I am going to ask you to turn to Deposition Exhibit
13   15, if you don't mind.
14   A.   Okay.
15   Q.   Do you recognize that document?
16   A.   Yes, ma'am.
17   Q.   What is it?
18   A.   It is a document from Superior Auctioneers informing
19   Mr. Martinez that --
20   Q.   Actually, can I stop you for a second, because I
21   just had something mismarked. That's not actually the
22   document I want to ask you about.
23   A.   Okay.
24   Q.   I am sorry.
25   A.   Okay. Checks. Okay.

34 (Pages 130 to 133)

Page 134

1    Q.   So, strike that.
2    A.   Okay.
3    Q.   But let me ask you about Deposition Exhibit --
4    A.   Sixteen is what is on the --
5    Q.   Yes. 16. I apologize.
6         Can you tell me what Deposition Exhibit 16 is?
7    A.   This is copies of checks I made to U.S. Customs
8    where they reclassified something to take care of this 1.5
9    percent on the line pipe.
10   Q.   Okay. So, the -- do you recognize on this document
11   two checks to U.S. Customs Service?
12   A.   Yes, ma'am.
13   Q.   And it totals around $3400?
14   A.   Yeah. Yes, ma'am.
15   Q.   And is it your testimony that these two checks were
16   paid to Customs as a result of Customs reclassifying some of
17   the line pipe?
18   A.   Yes, ma'am.
19   Q.   Which has nothing to do with anything in this
20   lawsuit?
21   A.   No, ma'am.
22   Q.   Will you look at deposition --
23   A.   This -- you're not asking me this, and don't --
24   listen to what I -- can we go off the record for a second?
25   Q.   Sure.

Page 135

1         (Discussion off the record.)
2    Q.   (BY MS. HARDIN)  Explain to me what these documents
3    are or why these documents are included as part of your
4    discussions with Customs.
5    A.   The check is to show where I went and settled the
6    claim with U.S. Customs on the line pipe.
7    Q.   And the shipment of the line pipe is totally
8    separate from the pipe that's shipped that's at issue here,
9    right?
10   A.   Yes, ma'am.
11   Q.   And would Deposition Exhibit 17 and 18 also relate
12   to the line pipe?
13   A.   Seventeen does; and 18 does, too. Yes, ma'am.
14   Q.   And can you identify what Deposition Exhibit 17 is
15   for the record?
16   A.   It's another -- it's just -- looks like an invoice
17   for what -- on that reclassification where they charged $43.26
18   for reclassification.
19   Q.   From the Customs department?
20   A.   Yes, ma'am.
21   Q.   And do you remember receiving this document?
22   A.   Not -- I remember the total situation. This
23   particular document, there was -- the only thing, Number 17 --
24   Q.   Yes.
25   A.   -- at the top you'll see handwritten notes on 17

Page 136

1    that correspond and go along with where we settled the deal
2    with Pete Martinez on the drill pipe.
3    Q.   Okay. Is that your handwriting?
4    A.   Top right is my handwriting.  Top left is my wife's
5    handwriting.
6    Q.   You mean bottom left?
7    A.   Yeah. What did I say?  Yeah. Bottom left is my
8    wife, top right is mine.
9    Q.   Okay. So, the actual handwriting on this document
10   does relate to the pipe at issue here but the actual document
11   does not?
12   A.   The -- the handwriting on the top right does, I
13   believe. Yes, ma'am.
14   Q.   Okay. And can you tell you us what Deposition
15   Exhibit 18 is?
16   A.   Just an invoice for the same 1.5 percent on the line
17   pipe. It's not pertaining to this.
18   Q.   Do you think structural drill pipe carries with --
19   carries with it no duties?
20   A.   I would think it wouldn't because it's not -- I
21   don't know the answer to that.  It -- it's possible it could
22   have at the time. I don't know. It doesn't now. Then, I
23   don't have no idea.
24   Q.   Let's look at Deposition Exhibit 13, if you would.
25   A.   Okay.

Page 137

1    Q.   Can you -- do you recognize this document?
2    A.   Yes, ma'am.
3    Q.   And do you see the date on this document as February
4    5th, 1997?
5    A.   Uh-huh.
6    Q.   And do you see your signature down at the bottom?
7    A.   Yes.
8    Q.   And is this a letter to Pete Martinez at Customs?
9    A.   Yes.
10   Q.   Does this letter -- have you had a chance to read
11   the letter?
12   A.   Yes.
13   Q.   Does this letter have anything to do with the pipe
14   at issue in this case?
15   A.   Yes, ma'am.
16   Q.   Before we talk about this letter specifically, I
17   want to get an understanding of what took place.  You sold the
18   pipe at auction, and you may have sold some of the pipe to
19   someone else; but then what happened?
20   A.   I took my licks and went on down the road until I
21   got notified from Customs that there was a dumping fee --
22   Q.   And --
23   A.   -- that had been asserted towards this drill pipe.
24   Q.   -- at what point were you notified by Customs that
25   there would be a dumping fee?

Page 138

1    A.    It would have been shortly before this date.

2    Q.    Did you receive paperwork, or did someone call you

3  and tell you?

4    A.    I don't remember.  There should -- there should be a

5  paper trail.  I'm not sure if it's here or not.

6    Q.    Well, I haven't seen any paperwork; so --

7    A.    If -- I -- honestly, I couldn't tell you.  They

8  might have called Parker; Parker might have called me.  I

9  really don't know.

10    Q.    You don't remember one way or the other?

11    A.    No, ma'am.

12    Q.    Do you have any paperwork in a file that you brought

13  with you that would show when Customs first communicated with

14  you to suggest that there are -- or to indicate that there

15  would be a dumping fee?

16    A.    The exact paperwork saying that, no.  The only thing

17  I have is the paperwork that Customs gave me a couple days

18  before this letter was wrote.

19    Q.    Okay.  What paperwork was that?

20    A.    Well, I have several documents.  I have computer

21  printouts that Customs give me telling me what to do, who to

22  send it to, and clarify all this.

23    Q.    Okay.  I want to attach all of those things; so,

24  walk me through what you have that would show Customs

25  contacting you or telling you about the dumping fees and what

Page 139

1  you needed to do.

2    A.    Okay.

3          Actual notification, I am not sure how I got it,

4  whether I got it by phone or if I got it in writing or if

5  Parker told me.  I don't know how I received it.

6    Q.    And you don't have any paperwork to show that?

7    A.    Not that I'm aware of --

8    Q.    Okay.

9    A.    -- or it would be in my file.

10    Q.    Okay.

11    A.    I go -- after I am notified of this, I go to Parker,

12  meet with them.  We discussed the situation.

13    Q.    And this was sometime in 1997?

14    A.    Yes, ma'am.  It would have been a few days before

15  this (indicating) right here.

16    Q.    Before February 5th --

17    A.    Yes, ma'am.

18    Q.    -- 1997?

19    A.    Yes, ma'am.

20    Q.    Who did you meet with at Parker?

21    A.    Pilo Walters.  I'm positive of that.

22    Q.    Anyone else there?

23    A.    Best I -- that particular meeting, we were standing

24  right in the front of the office.  We didn't even go to the

25  conference room.  There was probably other people there, but

Page 140

1  it wasn't even in the conference room.  It was like when you

2  walk in the front door and go through reception, and we were

3  standing right there in the middle of the lobby.

4    Q.    What made you go visit Parker in person?

5    A.    Well -- to Pilo.

6    Q.    Or Pilo.

7    A.    Yeah.

8    Q.    What made you go in person?

9    A.    To Parker & Co.

10    Q.    But what made you not just pick up a phone and say,

11  "I have gotten notice from Customs that there's some dumping

12  fees"?

13    A.    Oh, I did by phone also.

14    Q.    Okay.

15    A.    I'm sorry, I didn't tell you.  But this is such a

16  serious deal and it was so much money, it was something a

17  phone call wouldn't justify.  I mean, you had to go -- you

18  know, you had to do face time.

19    Q.    So, you made a phone call; and then you travelled to

20  The Valley to go to talk with Pilo Walters?

21    A.    Yes, ma'am.

22    Q.    Tell me about that conversation.

23    A.    We went and discussed it.  I asked them to go take

24  care of it.  And they said:  Well, it looks better if you go

25  yourself.

Page 141

1    Q.    What did you want them to do in terms of taking care

2  of it?  What did you mean by that?

3    A.    To go explain to Customs we didn't even receive the

4  goods that we were being charged for.

5    Q.    Okay.  And, so, my understanding is that Pilo told

6  you it's better if you handle it yourself?

7    A.    Yeah.  He said go try to do it yourself.  It's much

8  better.  You know, just lay everything out on the table and be

9  honest with the guy, and everything will probably work out.

10    Q.    Okay.

11    A.    I walked out of there that day, out of Customs,

12  everything was worked out.

13    Q.    Well -- so, you went straight to Customs that day?

14    A.    Yes, ma'am.

15    Q.    Okay.  Who did you meet with at Customs?

16    A.    Pete Martinez.

17    Q.    Did you have an actual meeting set up; or did you

18  just show up and say, "I need to speak with Mr. Martinez"?

19    A.    No, it was -- I had a meeting set up.

20    Q.    Okay.  Tell me what happened in that meeting?

21    A.    We took care of two issues.  We took care of the

22  issues on the other one-and-a-half percent we -- it was some

23  type of negotiation.

24    Q.    What was the negotiation?

25    A.    Settle for a figure, you know.  They -- they said

Page 142

1  something, and I said something else; and nobody could make up
2  their mind. And I said, "Okay. Will you settle on this
3  figure?"
4       We settled on that figure on the -- on the -- on the
5  line pipe.
6  Q.  So, the checks that we looked at a minute ago, that
7  money would have been paid based on the settlement you
8  reached --
9  A.  Yeah, it was --
10  Q.  -- with Customs --
11  A.  -- it was --
12  Q.  Let me finish. Let me finish.
13       The checks that we looked at earlier, that money
14  would have been paid based on the settlement you reached with
15  Mr. Martinez?
16  A.  Yes, ma'am.
17  Q.  And that had to do with the line pipe?
18  A.  Yes, ma'am.
19  Q.  And did Parker -- were they involved at all with the
20  discussion on the line pipe or with the duties that were
21  placed on the line pipe; or did you handle that all yourself?
22  A.  The same type deal. It -- it wasn't a big issue;
23  $3,000 on a 200,000-dollar deal wasn't a big deal, you know.
24  Q.  Okay. So, you go to Customs. And did you take any
25  paperwork with you?

Page 143

1  A.  Of course.
2  Q.  What paperwork did you take with you?
3  A.  Probably if there is any notices in here, I took
4  notices with me. Probably took copies of, you know, of the
5  invoices or a list of numbers that were at issue, you know,
6  one of these lists. I don't know which one.
7  Q.  Okay. So, as you sit here today, you don't really
8  remember exactly what you took?
9  A.  As far as what I took, no.
10  Q.  And aside from the initial notification you had
11  received from Customs, have you -- had you at that point
12  received any other kind of notification or letters from
13  Customs about this antidumping duty?
14  A.  No.
15  Q.  When you went to meet with Mr. Martinez, did he give
16  you any documentation?
17  A.  He give me computer runs. He give me copies out of
18  his law books of how to reclassify it to do away with the
19  dumping fees.
20  Q.  Okay. And what did he tell you you needed to do to
21  reclassify to get -- to extinguish the dumping fees?
22  A.  Okay. Are we ready? One thing is to write this
23  letter (indicating), is -- is one thing he told me to do.
24  Q.  To write the letter that's identified as Deposition
25  Exhibit 13?

Page 144

1  A.  Correct.
2  Q.  Okay. What else did he tell you to do?
3  A.  Okay. He also had me write another letter that I
4  wrote to him that you should have a copy of.
5  Q.  That we marked as Deposition Exhibit 14, I believe.
6  A.  Correct.
7  Q.  All right. What else did he tell you to do?
8  A.  He said do all that, it would be taken care of. It
9  was a done deal.
10       Also, I am 99 percent sure that this right here,
11  this message here on the top of Number 17 --
12  Q.  Uh-huh. Yes.
13  A.  -- related to telling Diana -- or Dianne that it had
14  been taken care of also.
15  Q.  Who is Diana?
16  A.  She is in the Customs office in -- in Indianapolis.
17  Q.  What do you mean, taken care of?
18  A.  The antidumping fees had been waived.
19  Q.  And they would be waived based on the pipe being
20  reclassified?
21  A.  Of -- yes. Reclassifying as defective merchandise
22  per federal regulation such and such, such and such, that
23  Mr. Martinez give me; and he give me a copy of the regs
24  straight out of his book and said, do this, and it's all taken
25  care of.

Page 145

1  Q.  Aside from writing the two letters to Mr. Martinez
2  that are identified as deposition Exhibits 13 and 14, did you
3  send him any other type of information?
4  A.  Not -- no, ma'am. Not that I'm aware of.
5  Q.  Did you file any paperwork with Customs?
6  A.  No, ma'am.
7  Q.  Okay. Can you identify for us what information in
8  your file Mr. Martinez from Customs gave you?
9  A.  Okay. He gave me copies of their computer runs,
10  straight out, plus the notes I took while I was sitting in his
11  office.
12  Q.  And what do the copies of the computer runs show?
13  A.  I believe all of these computer runs here show line
14  pipe.
15  Q.  Okay. But line pipe is not at issue here, right?
16  A.  No. I was taking care of all of this at the same
17  time.
18  Q.  Okay.
19  A.  Both issues, the same trip to Mr. Martinez's office.
20  Q.  Okay. Go ahead.
21  A.  As you can see here, it looks like they were going
22  to assess me $64, and we negotiated it down to the
23  40-something-dollars, looks like, what they charged me.
24  Q.  And let's go ahead and mark what you're looking at
25  as Deposition Exhibit 19.

37 (Pages 142 to 145)

Page 150

1  of country for a competitive pricing.
2      Q.   And do you have an understanding of what the purpose
3  of placing a dumping fee on particular pipe is?
4      A.   It makes it cost so much money that you can't afford
5  to bring foreign pipe in.
6      Q.   Your next sentence says, "Scrap from PEMEX has been
7  selling for 62 to $65 per ton," correct?
8      A.   Yes, ma'am.
9      Q.   What was your point of saying that?
10     A.   The same thing.  If I was going to end up being
11  assessed a duty, at least you assess it on the product that I
12  received.
13     Q.   So, you're trying to show that -- the U.S. Customs
14  the worth of what you actually received?
15     A.   Yes, ma'am, because I did not receive the goods that
16  I bought.
17     Q.   The next paragraph, "If we take the cost of 75 U.S.
18  dollars per ton and add freight and crossing fees, it would
19  have been a break-even transaction; and then add the dumping
20  fees, which was totally unexpected," correct?
21     A.   Yes.
22     Q.   And when you say a break-even transaction, did you
23  lose money when you sold this pipe, based on what you had
24  originally paid for it; or did you actually make money on it?
25     A.   No, I lost money on the total deal; but -- and I am

Page 151

1  not asking anybody to make it up or -- or anything else.  I am
2  just saying, you know, I would have been foolish to have done
3  it.
4      Q.   Well, and you say you're not asking anybody to make
5  up for that money; but, I mean, it certainly wouldn't be
6  Parker's responsibility that the pipe -- that the wrong pipe
7  came into the country, would it?
8      A.   No, ma'am.  I am not asserting that at all.
9      Q.   Okay.  Your next paragraph, you talk about the price
10  of the pipe.  And you mention, "After we paid Mr. Avila, he
11  turned around and resold our good pipe, which left us with
12  nothing but junk pipe," correct?
13     A.   Correct.
14     Q.   And that is just what we have been talking about
15  here, that the wrong pipe was imported, right?
16     A.   Uh-huh.
17     Q.   "We didn't realize this until Houston.  Since we
18  were not aware of the Customs dumping fees, we made no attempt
19  to contact your office."
20          What did you mean by that?
21     A.   When I got screwed by somebody in Mexico, I didn't
22  go crying to Customs that the wrong pipe was brought across.
23     Q.   And you believed at that time that the dumping fees
24  were being charged because you had brought in, according to
25  Customs, drill pipe, right?

Page 152

1      A.   At a value.  The Customs fee is set on a value, of
2  which I valued the truckloads.  This -- I was 100 percent
3  legit.  I mean, I wasn't -- wasn't trying to screw the
4  Government or anybody.  I put the true value of the pipe down.
5      Q.   But you would agree with me that the reason that
6  Customs placed a dumping fee on the pipe is because it was
7  classified as drill pipe because that's what you thought you
8  were entering or bringing into the country?
9      A.   Yes.  Originally, yes, that's correct.  I believe
10  you're going to find that it -- regardless of whether it said
11  junk, scrap, or whatever, it did say drill pipe.  What I don't
12  know -- since we don't have copies of those particular
13  invoices, I don't know what they say; but it was brought
14  across as drill pipe.
15     Q.   And in your next paragraph, you say, I don't -- "I
16  now know who bought our pipe from Mr. Avila and can get sworn
17  statements, if necessary, to this effect," correct?
18     A.   Yes.
19     Q.   Who did you know had bought the pipe from Mr. Avila?
20     A.   A guy in Victoria by the name of Jim Elsworth bought
21  part of it.
22     Q.   And did you ever get any kind of sworn statement
23  from him?
24     A.   Nobody requested it.
25     Q.   What did you expect him to say?

Page 153

1      A.   Just that he bought --
2      Q.   The pipe that was intended for you?
3      A.   Well, but that he bought pipe that was located at --
4  at PEMEX Cactus 43 yard, because he had -- he went in there
5  and bought it there from Avila.  But I never went to him for
6  any money.  I mean, it -- he wasn't the crook in the deal.  He
7  didn't know any better.
8      Q.   And you never sued Mr. Avila?
9      A.   Done no good.
10     Q.   After you sent this letter, did you hear anything
11  back from Customs?
12     A.   No, ma'am.  Not for seven years.
13     Q.   Before we get to seven years later, if you
14  turn to Deposition Exhibit 14, there is another letter you
15  wrote, correct?
16     A.   Okay.  Yeah, that's when I said seven years.
17  Until -- until all this was taken care of here in '97, I
18  hadn't heard nothing else.
19     Q.   What made you send an additional letter?
20     A.   Mr. Martinez requested it.
21     Q.   Okay.  Do you have -- did he pick up the phone and
22  call you, or do you have any paperwork that would show him
23  contacting you?
24     A.   No.  I don't remember exactly how that went down --
25     Q.   Okay.

39 (Pages 150 to 153)

Page 158

1  Deposition Exhibit 22 has to do with the line pipe that is not
2  at issue here?
3      A.   Yes, ma'am. As far as I can tell, it is.
4      Q.   And aside from your note on Deposition Exhibit 19,
5  does it have anything to do with the pipe that's at issue
6  here?
7      A.   We don't need Exhibit 22. It's identical to 19.
8  It's -- well, as far as the rest -- the rest of this, all
9  the -- all the type in it -- everything on Exhibit 20, as far
10 as the computer generated printing, is the same as 19.
11     Q.   Okay. Well, then, tell me when you would have
12 written the note that's on Deposition Exhibit 19. Would that
13 have occurred at your first meeting?
14     A.   No. It would have occurred at the second meeting.
15     Q.   Okay. So, would it have really been Deposition
16 Exhibit 21 that was given to you at the first meeting?
17     A.   Twenty-two
18     Q.   Twenty-two. Excuse me.
19     A.   I couldn't say.
20     Q.   And was it your understanding from Mr. Martinez when
21 you left the second meeting that you had in May of 1997 that
22 you needed to write him one more letter before the antidumping
23 fees could be extinguished?
24     A.   Yes, ma'am.
25     Q.   Okay. And aside from writing him a letter, was

Page 159

1  there anything else that you believed you needed to do?
2      A.   No, ma'am.
3      Q.   And what did he ask for you to put in this letter?
4      A.   Well, there was my handwritten notes, plus what I
5  wrote on -- my handwritten notes on Exhibit 19. And the
6  letter that I wrote, 14, was -- you know, was verbatim of how
7  he told me to word it and send it to him; and everything would
8  be taken care of.
9      Q.   And I understand from this letter in the first
10 paragraph that you sent to him a copy of the receipt from
11 Superior auction -- excuse me -- a letter from Superior
12 auction; is that correct?
13     A.   Yes, ma'am, we already have that.
14     Q.   And we marked that as Deposition Exhibit --
15     A.   Fifteen.
16     Q.   -- fifteen?
17          And in that letter, it discusses what kind of pipe
18 you sold and at what price, correct?
19     A.   Fifteen describes three-and-a-half-inch and
20 five-inch drill pipe --
21     Q.   And that --
22     A.   -- structural grade.
23     Q.   -- and that is the pipe at issue in this case?
24     A.   Yes, ma'am.
25     Q.   And you also sent a copy of a wire transfer to Frank

Page 160

1  Avila. Do you have a copy of that in your file?
2      A.   Oh, okay. That's what that refers to. Send wire
3  transfer. That's what this -- on Exhibit 19, I couldn't
4  remember what wire transfer meant, yes, ma'am.
5      Q.   Okay. Do you have a copy of that wire transfer in
6  your file?
7      A.   Very, very poor copy. It's right here (indicating).
8  We already had it out to make copies of. This is from the
9  olden days when we had the old fax paper.
10     Q.   So, we can't really read anything on it?
11     A.   Well, I mean, you can read it; and I went and
12 penciled it in there, that's the exact amount. If you get it
13 just right, you can see -- if you get it just right in the
14 light, you can see it. I don't know anything else to do. I
15 tried to make a copy of it. This is to show where I actually
16 bought it from Franco and how much I paid.
17     Q.   Okay.
18          MS. HARDIN: Let's mark that as Deposition
19 Exhibit 23, even though we can't really read it.
20          Do you mind putting it on there.
21          MR. THOMPSON: Stick it on there, Rex.
22          THE WITNESS: Yeah. Hold on a second.
23          (Exhibit 23 marked.)
24          THE WITNESS: Okay. I see what's going on.
25 Had me scared for a second.

Page 161

1      Q.   (BY MS. HARDIN) And what do you see that's going
2  on?
3      A.   The -- the copy of the wire transfer I got, I went
4  and asked for it after the fact from the bank; and I received
5  it on -- oh, the date's down here -- May 13 -- May 13th, I
6  went and got a copy from the bank that matches with the May
7  14th here to go get it; but it was on March the 22nd when I
8  actually paid it.
9      Q.   And after you sent this information to Mr. Martinez,
10 did you hear from him again?
11     A.   There was a phone call, the best I recollect, or
12 maybe there wasn't. I don't know. He said if -- once you get
13 this, if you don't hear from me, it's a done deal.
14     Q.   Did you ever call him to confirm that the dumping
15 fees had been extinguished?
16     A.   I can't say yes or no. All the paperwork stopped.
17 I never heard another word.
18     Q.   Did you ever write him to confirm, or write anyone
19 at Customs to confirm, that the dumping fees had been
20 extinguished?
21     A.   No, ma'am, there was nothing in writing, I know for
22 a fact.
23     Q.   Did you contact Parker to confirm that the dumping
24 fees -- or to ask them to confirm that the dumping fees had
25 been extinguished?

41 (Pages 158 to 161)

Page 162

1    A.    To confirm, no.
2    Q.    Did you ever call Parker and tell them: I have
3    spoken with Mr. Martinez. I sent him the information. The
4    dumping fees should be extinguished?
5    A.    Oh, yeah, we talked about it several times.
6    Q.    And during this time in spring of 1997, your contact
7    with Parker was with Pilo Walters, correct?
8    A.    Yes, ma'am.
9    Q.    And I assume you were keeping him apprised -- or
10   strike that.
11         Were you keeping him apprised of your communications
12   with Customs?
13   A.    Yes, ma'am.
14   Q.    Aside from keeping Mr. Walters apprised, was Parker
15   participating at all in this letter writing or providing
16   information to Customs?
17   A.    Not directly. After Parker told me to go and talk
18   to Mr. Martinez directly --
19   Q.    You handled it yourself?
20   A.    Yes, ma'am.
21   Q.    There was a note I saw that suggested, in January of
22   1997, you filed some kind of protest. Did you file any kind
23   of official protest with Customs?
24   A.    If I did, I sure don't recall. If I did, it was
25   something Parker told me to do.

Page 163

1    Q.    Well, you don't recall doing it?
2    A.    No, ma'am.
3    Q.    And I take it you didn't hire anyone to file a
4    protest from you -- for you?
5    A.    As far as I know, I didn't.
6    Q.    After this letter, you didn't hear -- strike that.
7         After your May 14th, 1997, letter, which is attached
8    as Exhibit 14, you didn't hear anything else from Customs?
9    A.    I didn't hear anything from Customs until February
10   of 2003.
11   Q.    Did you have any dealings with Parker in-between
12   1997 and 2003?
13   A.    Between -- between ninety -- be sure I don't get
14   nothing out of you-all's and my files. That goes there
15   (indicating).
16        I don't think I have anything with me. For some
17   reason, I am thinking my transactions with Parker stopped
18   somewhere in this approximate same time. That's when they
19   informed me they didn't want to do business with me no more.
20   Q.    Who informed you of that?
21   A.    Pilo Walters.
22   Q.    Why did he say he didn't want to do business with
23   you anymore?
24   A.    My -- the type of material I imported was too
25   complicated. They decided they didn't want to do business

Page 164

1    with people like me, and they was going to change directions.
2    Q.    Did he tell you what direction they were going to go
3    in?
4    A.    More into the maquiladora stuff.
5    Q.    What's that?
6    A.    Where U.S. people -- U.S. -- the big companies have
7    things made in Mexico -- wiring harnesses, clothes, et cetera,
8    et cetera. It's -- things like that.
9    Q.    When Mr. Martinez told you there was a certain code
10   provision that you could rely on to help get these dumping
11   fees extinguished, did he explain anything to you about that?
12   A.    Yes, ma'am. He give me a copy of it to read.
13   Q.    What did he tell you about it?
14   A.    To -- to send this letter, and it would -- he
15   would -- he would manually go in, change the code that it was
16   brought in under, and there would be no duties due.
17   Q.    What was your understanding of what that code
18   provision meant or entailed, if you have one?
19   A.    It's defective merchandise so that you brought --
20   you prepared the paperwork, brought something to the border to
21   ship it over, paid the duties, or whatever, on that product;
22   and then when you got it, either it was damaged or switched,
23   et cetera, et cetera. You did not receive the goods that were
24   on paper.
25   Q.    Okay. And, so, it was your understanding of why

Page 165

1    this pipe at issue was defective, that it was not what you
2    paid for and intended to purchase?
3    A.    Yes. And it -- and it is also -- I claimed this
4    pipe, based on one of the documents, that the value of this
5    pipe was $6,389 a load. That was not the value -- even though
6    that's what I paid for what I got, that's not the value of
7    what I received. What I received was worth 62 or $65 a ton,
8    which would -- a truck holds 20 tons, that's $1200. If I was
9    assessed any duty, it should be assessed on $1200 instead of
10   $6,389.
11   Q.    I understand that.
12        And I just want to make sure that your claim that
13   the pipe was defective is based on you receiving pipe that was
14   different than what you paid for?
15   A.    I think that's correct. I mean, I -- I received --
16   I bought and paid for good, premium pipe that could be reused.
17   I received junk structural, chatarra, whatever you want to
18   call it, pipe.
19   Q.    And because the pipe that you received was
20   structural pipe, you felt like it fell under defective pipe,
21   correct?
22   A.    That's what Mr. Martinez told me.
23   Q.    And that's what you believed?
24   A.    Yes, because I had never received another word from
25   Customs.

42 (Pages 162 to 165)

Page 182

1    Q.   And it's your belief that that also includes any
2    kind of dispute you might have with Customs?
3    A.   As far as filing it, et cetera, et cetera. If -- if
4    there is actually monies due -- I mean, if it was their fault
5    and they're negligent, yeah, I think they have a lot of
6    responsibility.
7    Q.   Well -- and my question -- I want to be real
8    specific about this, because you have testified all along that
9    it wasn't Parker's fault that the wrong goods got entered and
10   that Parker originally classified the goods correctly. You
11   said that, correct?
12   A.   Yes, that part. They -- but they originally -- we
13   wouldn't even be sitting here if they would have found out
14   that there was a dumping duty on this pipe to start with;
15   whether it was good, bad, or ugly, we wouldn't be sitting here
16   today.
17   Q.   And that's because you wouldn't have bought the
18   pipe?
19   A.   Absolutely.
20   Q.   And any failure on their part to tell you that there
21   would be a dumping fee for goods imported from Mexico would
22   have occurred in 1996, correct?
23   A.   I believe you're correct, yes.
24   Q.   Okay. And I just want to make sure I am totally
25   understanding what you're saying. You believe that you hired

Page 183

1    Parker to help you import these goods; and that if there was
2    any kind of problem, part of what you were paying for is for
3    them to clear that up as well? That's your testimony?
4    A.   It is -- I felt -- I felt like then, I feel like
5    now, they have -- it is part of their responsibility, if there
6    is a protest, to file a protest.
7    Q.   You thought that's part of what you were paying for
8    back in 1996, that if there was a protest about any of the
9    goods that you were bringing into the company [sic], you were
10   paying Parker then to take care of that protest? That's your
11   testimony?
12   A.   I didn't really know what a protest was. Even
13   though you found something where we filed one, they -- they
14   had to tell me how to do it. Yes, ma'am, anything that was
15   paper related --
16   Q.   You thought they -- part of what you were paying for
17   was for them to handle it?
18   A.   Yes, ma'am.
19   Q.   Okay. And just so we're clear, my question about a
20   protest earlier about 1996 --
21   A.   Uh-huh.
22   Q.   -- was from your interrogatory responses that we
23   will go over later --
24   A.   Okay.
25   Q.   -- it wasn't a specific document, so you know that.

Page 184

1    A.   Okay.
2    Q.   So, you go in and have this meeting; and you suggest
3    to Mr. Pritchard and Mr. Torres that you need to file a
4    protest? Or -- I want to understand exactly what happened.
5    A.   Okay. I have talked to Joe, whatever his last name
6    is, in Laredo.
7    Q.   Okay.
8    A.   He told me I had to file a formal protest, go
9    through this channel and do this piece of paper, this piece of
10   paper, and this piece of paper.
11   Q.   Okay.
12   A.   Well, at this time, I am frustrated enough that
13   Parker didn't handle it the first time, I called Mr. Pritchard
14   and I said, you know, "Instead of me filing it or me doing
15   anything this time, you need to do it and make sure it is done
16   right instead of sending me down there to do it."
17   Q.   And when you're talking about it not being done
18   right, that was back in 1996, 1997, correct?
19   A.   When -- correct. There should have been more done
20   than this (indicating), than the -- the letters I wrote to
21   Mr. Martinez.
22   Q.   Okay. And, again, the more that you thought Parker
23   should have been done, that would have been in 1997, correct?
24   A.   Yes.
25   Q.   Okay. So, you suggest to Garland Pritchard that you

Page 185

1    have to file a protest based on your conversation with Joe; is
2    that right?
3    A.   Correct.
4    Q.   Okay. And what else happened? What was said?
5    A.   Okay. I went in and met with -- with Joe first; and
6    then he brings down Jorge, which is their something, something
7    of compliance.
8    Q.   And you meant you met with Garland Pritchard, not
9    Joe, correct? You just said -- I just wanted to make sure the
10   record is clear.
11   A.   Did I say it right? Joe is the Customs guy in
12   Laredo.
13   Q.   Right. But when you met with Parker, it was with
14   Garland and Parker, right?
15   A.   It was with Garland and with Jorge Torres --
16   Q.   Okay.
17   A.   -- who is the director of trade compliance, which
18   takes care of making sure that everything complies with the
19   Government code. I mean, this -- his title right there says
20   he makes sure everything complies.
21   Q.   Okay.
22   A.   So, this right here tells you that Parker is
23   supposed -- when they fill the paperwork out, they're supposed
24   to make sure everything complies. Well, part of that
25   compliance is to tell me what my responsibility is.

47 (Pages 182 to 185)

Page 190

1  23rd, 2003 --
2     A.   Okay.
3     Q.   -- to Garland Pritchard; is that right?
4     A.   Yes, ma'am.  And that would have been a copy of what
5  I sent to him.
6     Q.   Okay.  Let's include this together, then.
7     A.   Staple or something.
8          (Exhibit 29 marked.)
9     Q.   (BY MS. HARDIN)  Before I ask you some questions
10 about this -- well, let me ask you this:  Deposition
11 Exhibit 29 is a fax cover sheet and one page from the
12 insurance company.  Was there anything else attached to this
13 fax, to your knowledge?
14    A.   No, ma'am.
15    Q.   Okay.
16    A.   Now, that's what -- like I said, that's my
17 terminology.  When I say "find letter from insurance company,"
18 that means attached.
19         I have also asked him to send me something else on
20 the protest so I can send it to the insurance company to show
21 them that we're doing something.
22    Q.   Okay.  After you left this meeting with
23 Mr. Pritchard and Mr. Torres, did you talk to any lawyer about
24 helping you file a protest?
25    A.   No, ma'am.  They said --

Page 191

1     Q.   Did you send any letters to Customs about filing a
2  protest?
3     A.   No.  Jorge told me he was doing all that.
4     Q.   So, the answer is, no, you did not?
5     A.   No, ma'am.
6     Q.   Did you contact Customs to talk to them about filing
7  a protest?
8     A.   No, ma'am.
9     Q.   When you met with Mr. Pritchard and Mr. Torres, did
10 you have any discussion with them about paying for them to
11 file this protest?
12    A.   I told them -- I told them that they should have
13 done it right the first time.  They didn't.  I expected them
14 to file this protest and not send me a bill.
15    Q.   And, again, that's based on your belief that you
16 paid them originally to file a protest?
17    A.   Yes, ma'am.
18    Q.   That was part of the original payment you gave them?
19    A.   Yes, ma'am.
20         And they agreed.  They didn't tell me anything --
21 you know, they didn't say:  No, we're not going to do it.
22 They said:  Okay.  We'll file the protest.
23         Now, they said:  We can't guarantee the results, you
24 know.
25         And I understand that.  Like I said, I am a big guy.

Page 192

1  But they said they would file the protest.
2     Q.   And specifically about the money, did they agree you
3  didn't have to pay them?
4     A.   They said if everything that I was saying was true,
5  it's nothing but a mistake, all that will be straightened out
6  in the protest.
7     Q.   Did you say to you -- did they agree with you that
8  you didn't have to pay them to file the protest?
9     A.   It never was discussed any further.  I said -- I
10 said:  I have already paid you once to take care of this.  I
11 want it taken care of this time.
12    Q.   But did they ever agree that they wouldn't send you
13 a bill?
14    A.   No, they never agreed that they wouldn't send me a
15 bill or they would or they wouldn't.  I just said:  I have
16 already paid you once -- you know.
17    Q.   And, again, you paid them once to bring the goods
18 into the country?
19    A.   And to file the proper -- the proper paperwork.
20 If -- if there was -- if I owed them something, I would have
21 paid them when all this happened; and I paid all my bills to
22 them.  Go ask them if I'm delinquent on anything.
23    Q.   Do you believe you entered a contract with Parker
24 that day?
25    A.   Absolutely.

Page 193

1     Q.   And the terms of that contract were what?
2     A.   Were for them to file the -- whatever paperwork it
3  took to file the protest.
4     Q.   And you expected them to perform that contract for
5  free, correct?
6     A.   For what I had already paid them.  All it was, was
7  to file an affidavit with Joe.  It was a deal of writing one
8  letter or filling out one form.  Take somebody in Jorge's
9  position that knows the -- that used to work for Customs --
10 we're talking about something that's probably a -- I have no
11 idea what it takes.  I don't know how big the form is.  If
12 it's one -- you know, one of these -- didn't we have some kind
13 of protest on it that was a one-page form --
14    Q.   I don't know.
15    A.   -- that you showed me earlier?
16    Q.   I don't believe so.
17    A.   To file a protest.  I mean --
18    Q.   Did Mr. Torres show you what form he thought needed
19 to be filled out?
20    A.   No, ma'am.
21    Q.   Did you-all ever sign anything in writing?
22    A.   No, ma'am.
23    Q.   Did you ever write any kind of letter to Parker
24 confirming that they were filing a protest?
25    A.   The cover letters that's on my faxes -- you know --

49 (Pages 190 to 193)

**Page 210**

1  A.  This was on June the 23rd. I didn't -- you know, I
2  think I got it wrote down somewhere -- I do not have a copy of
3  it -- the day I went to see him. I went and took and he made
4  copies of nearly all the paperwork. And he had a copy that
5  probably was forwarded to Parker, or he had it. And it -- it
6  would have been the day after, or the day of this
7  (indicating).
8  Q.  Of the fax that you received from Parker?
9  A.  Yes, ma'am.
10  MS. HARDIN: Let's mark that, too, as
11  Exhibit 31.
12  (Exhibit 31 marked.)
13  A.  So, when I got this letter, I seen things were
14  starting to get out of hand; so, I immediately rushed over to
15  see Mr. Hansen.
16  Q.  (BY MS. HARDIN) And what happened with your
17  discussion with Mr. Hansen?
18  A.  He said he's never seen anything so screwed up in
19  his whole life. He said Parker didn't even contact him until
20  the day before. They had never contacted him to get any
21  advice on this earlier. And he would love to have this case
22  and sue their... off.
23  He said: Would you like me to recommend somebody?
24  I can't, because it would be conflict of interest.
25  And I said: No, thank you. I am going to get out

**Page 211**

1  of the family. I am going to go to somebody I know.
2  Q.  Do you remember anything else about the conversation
3  that you had with Mr. Hansen?
4  A.  He said he couldn't believe Parker hadn't done more
5  than what they done. He was completely appalled.
6  Q.  And this conversation you had with him at --
7  occurred sometime after you received the fax --
8  A.  I received --
9  Q.  -- that's marked as Deposition Exhibit 31?
10  A.  Yes, ma'am. I went to see him one day, give him
11  copies of all of this; and then he asked me to come back the
12  next day. I come back the next day. He sat down, and he
13  said: I have never seen anything like this. I wish I was
14  representing you.
15  Q.  Do you remember anything else that you talked with
16  him about?
17  A.  He tried to refer me to one of his friends, as an
18  attorney, to Sue Parker; and I elected, you know, to go with
19  Mr. Grissom and Thompson.
20  Q.  Did you have any other discussions with Mr. Hansen
21  besides that day?
22  A.  No. I mean, he's -- I went back and picked up all
23  the papers after he copied them all, and he sent me a
24  Christmas card.
25  Q.  Did you have any discussion with Mr. Hansen that day

**Page 212**

1  in terms of what the protest process entails?
2  A.  If it would have been done in a timely manner,
3  it's very, very simple.
4  Q.  Are you aware of how unlikely it is to be successful
5  with a protest?
6  A.  They said with this situation, they -- even -- even
7  Mr. Hansen said it should have been no problem.
8  Q.  Are you aware that there is a presumption that the
9  Customs agency has correctly classified and placed duties on
10  goods? Did you know that?
11  A.  I don't really understand what you're saying.
12  Q.  Well, are you aware that there's a general
13  presumption in our law that Customs properly classifies and
14  places duties on goods?
15  A.  Yes, ma'am. They're human, and they make mistakes.
16  That's why all this was done to straighten it up back in '97.
17  Q.  But are you aware that the law assumes that they did
18  it the right way and that it is your burden to prove that they
19  didn't?
20  A.  Yes, ma'am. That's what the protest process was
21  about.
22  Q.  What documents would you have relied on to prove
23  that Customs improperly classified the pipe and placed an
24  antidumping duty on it?
25  A.  Everything I have showed you today that I also

**Page 213**

1  produced to Customs back in '97, and they -- and Mr. Martinez
2  agreed that I had performed -- supplied every piece of paper
3  he asked me to, to reclassify it.
4  Q.  When did he tell you that? Back in 1997?
5  A.  Yes, ma'am.
6  Q.  Do you have any proof you would have been
7  successful, had a protest been filed?
8  A.  No, nobody could have been 100 percent. No, ma'am.
9  Q.  Did Mr. Hansen ever tell you he would prepare the
10  protest for you?
11  A.  He said that he had con -- after Mr. Hansen looked
12  at this paperwork and realized Parker had not contacted him,
13  he -- he said he couldn't defend the case because he was
14  conflicted out, that it was -- it had got so bad, so nasty, he
15  was -- he was too conflicted to do anything.
16  Q.  Well, he was too conflicted to file a protest on
17  your behalf?
18  A.  I didn't want him filing a protest on my behalf.
19  Q.  Oh, you didn't?
20  A.  Oh, plus, the next day after all this, Parker told
21  him they would not pay him to do any work on my -- on my
22  behalf, either.
23  Q.  Would you have hired Mr. Hansen had Parker paid for
24  it?
25  A.  You know, I never really considered it because

54 (Pages 210 to 213)

KATHY MILLER, CSR
NELL MCCALLUM & ASSOCIATES - HOUSTON, TX  (713) 861-0203

Page 214

1  Parker -- I mean, that's why he was shaking his head. He
2  said: They sent you over here. Used their retainer. I tell
3  them how bad they screwed up, and now they don't want to take
4  care of it; and they're not going to pay me.
5      He says: Plus, I am going to be conflicted out.
6      If they would have said they would have paid it,
7  I -- I would have got some other advice; but Mr. Hansen was so
8  honest with me, I would have considered it. I don't know that
9  I would have, though. I would have definitely considered it.
10  I would have probably talked with Mr. Thompson and Mr. Grissom
11  to at least be co-counsel, or something.
12      Q.   What did you do after this discussion you had with
13  Mr. Hansen?
14      A.   Probably went straight to my truck, got on my cell
15  phone, and called Mr. Thompson.
16      Q.   Did you ever receive any other documents from
17  Customs?
18      A.   I just -- I just receive the monthly renewals.
19      Q.   Did you ever hire a Customs lawyer to look into
20  anything else you could have done at that point to remedy the
21  situation?
22      A.   Larry said it was -- Mr. Hansen said it was too
23  late.
24      Q.   To do anything?
25      A.   (Witness moving head up and down.)

Page 215

1      Q.   Did you ever investigate that on your own?
2      A.   Yes. Don, Mr. Thompson's partner, did call and talk
3  to the -- Christina, and he also called and talked to Joe. I
4  don't know. You know, like everybody said, it was too late.
5  Pay it. But Mr. Grissom made phone calls on my behalf.
6      Q.   If it is your understanding that an antidumping duty
7  was placed on these goods because they were classified as
8  drill pipe -- is that right?
9      A.   That's -- yes, ma'am, that's the way I understand
10  it.
11      Q.   -- what classification do you think that the pipe at
12  issue here, the pipe that you sold, what classification do you
13  think it should have had?
14      A.   Just what Mr. Martinez told me, defective
15  merchandise.
16      Q.   What classification under the Harmonized Tariff
17  Schedule do you think that pipe should have?
18      A.   In my opinion, it should probably have been as a --
19  as a double-type deal. It was defective; and if it was
20  defective -- as far as I am concerned, if it was defective
21  like they said it was, or like I say it was and like I proved
22  it was, they could go back, use the prorated numbers, and call
23  it anything they want to and pay something on $60 a ton
24  instead of $6,000 a load. So, they could call it drill pipe.
25      Q.   Okay. And I -- what I want to get from you is:

Page 216

1  Part of the protest process would be for you to tell Customs
2  how your pipe should have been classified under the Harmonized
3  Tariff Schedule. That would be part of your burden. So, I am
4  trying to understand for you -- from you how it would be
5  classified.
6      Have you ever seen the Harmonized Tariff Schedule?
7      A.   No, ma'am.
8      Q.   Okay. You have never seen it before?
9      A.   If I did, I didn't know what I was looking at.
10      Q.   Okay. If I have a copy of it for you, would you be
11  able to look at it and see if you can determine where your
12  pipe would have fallen in terms of the classification?
13      A.   I have no idea.
14      Q.   Let me just hand it to you and let you -- I'll let
15  you look at it and...
16      I am not going to mark this, but this is the
17  Harmonized Tariff Schedule that would have been in effect in
18  1996. And just so you know, I have it tabbed because I have
19  it marked what -- the second tab would be what your pipe was
20  classified as, to my knowledge.
21      Actually, now that I am thinking about it, that
22  would be related to your line pipe, that classification. So,
23  I don't know what your original drill pipe was classified as.
24  But if you can look at that Harmonized Tariff Schedule and
25  give us some idea of how you think your pipe should be

Page 217

1  classified as, that would be very helpful, if you know.
2      A.   Well, if -- you know, I am not sure. I
3  understand -- still, you would just have to go through this --
4  like I said, it's not my job to -- I'm not -- this is not what
5  I do. I hire people to do this.
6      Q.   And I understand that.
7      And looking at that, it has different types of pipe.
8  So, being, basically, an expert in types of pipe, that's why I
9  am trying to ask you if you know in what way the pipe that's
10  at issue in this lawsuit should be classified.
11      A.   I cannot say. The Customs agent, this Joe and
12  Martinez, that's what they were, experts -- they were guys --
13  that was their job. These guys, they didn't do -- the way I
14  understand it, they didn't do produce and clothes. They done
15  pipe- and steel-related products.
16      Q.   Would you agree with me that the pipe that you
17  brought in -- strike that.
18      Would you agree with me that if the pipe that you
19  actually imported, the structural pipe --
20      A.   Uh-huh.
21      Q.   -- carried with it the same duty as the drill pipe,
22  that your protest wouldn't be successful?
23      A.   Wait a minute. The pipe that I actually brought
24  in --
25      Q.   Uh-huh. If it had the -- a duty that was the same,

KATHY MILLER, CSR
NELL MCCALLUM & ASSOCIATES - HOUSTON, TX   (713) 861-0203

Page 218

1  let's say, as the drill pipe, then --
2      A.   Well, at --
3      Q.   -- then you would still owe that money, wouldn't
4  you?
5      A.   Which duty?
6      Q.   Well, I guess part of what I -- my point is -- to
7  you is: Even though the pipe that you actually imported was
8  different than what you expected --
9      A.   Uh-huh.
10     Q.   -- it still may have carried a duty with it, right?
11     A.   Yes, ma'am, it may have.
12     Q.   And you don't know whether it did or didn't, do you?
13     A.   If it had -- if they would have signed it some other
14 classification, which they -- I don't know what they done
15 until Pete Martinez said that it was defective. But if they
16 would have -- had -- had assigned it a different -- to fall
17 under a different category, you know, that was probably okay,
18 if they would have reassessed the value, because everything is
19 on assessment of purchase price.
20     Q.   But the actual percentage duty imposed is a set
21 percentage?
22     A.   Percentage on your cost.
23     Q.   Right. I understand that.
24     A.   So -- never mind.
25     Q.   But if, for example, structural pipe, the kind of

Page 219

1  pipe you imported, carried with it a duty --
2      A.   Uh-huh.
3      Q.   -- you would be responsible for that duty, right?
4      A.   If I had bought structural pipe and I had brought it
5  across and I was assessed what I paid for it, yes, I'd be
6  prepared. If I know everything up front, I'm prepared for it.
7  It's not a problem. You figure it in your price.
8      Q.   Well, do you have any proof or anything that would
9  suggest to you that the structural pipe you brought into this
10 country shouldn't have a duty placed on it?
11     A.   No, ma'am. I don't -- I don't know where it would
12 fall. When we went and talked to -- we -- when I personally
13 went and talked to Mr. Martinez, he looked the whole
14 circumstance over, he said, "This doesn't need to be brought
15 in as structural drill pipe or as scrap pipe or as scrap
16 tubes. It needs to be brought in as defective merchandise."
17         This is what he told me to reclassify it as. After
18 he looked at all the merchandise, made -- I mean, at all the
19 paperwork, he made the assertion and said, "Rex, this is what
20 you need to do. This is what you need to do." It wasn't I
21 elected to or Parker elected to. It's what Pete Martinez told
22 me to do.
23     Q.   But you would agree with me that even if Parker had
24 filed the protest, in order to be successful and in order for
25 the duties to be extinguished, you would have had to prove

Page 220

1  that they weren't proper in the first place, correct?
2      A.   That's -- that's the -- the gist of it. But I also
3  feel like Parker has some responsibility for not knowing that
4  there was a dumping duty when I asked them, "What is the
5  duties on this?" And -- and they tell me they're zero.
6      Q.   Okay. And, again, that happened back in 1996 or
7  '97, correct?
8      A.   It's still the same. Yes, ma'am. But that --
9  that's what this is all about, the '96-'97 deal.
10     Q.   But, as you sit here today, you would agree with me
11 that even if Parker had filed a protest, that protest would
12 not have been successful unless you proved that the
13 antidumping fees shouldn't have been assessed in the first
14 place, correct?
15     A.   I didn't understand.
16         MS. HARDIN:  Let me read back the question.
17         (The requested portion was read.)
18     A.   When? Filed a protest when? Originally when it
19 originally happened?
20     Q.   (BY MS. HARDIN) I'll reask my question so we're
21 clear.
22     A.   Okay.
23     Q.   You would agree with me that even had Parker filed a
24 protest in 2003, that in order to be successful at that
25 protest, you would have had to have proven that the dumping

Page 221

1  fees shouldn't have been assessed in the first place, right?
2      A.   Partially correct. Either they were -- they would
3  have to prove -- or I would have to proven that all this took
4  place with Pete Martinez, and if -- when -- when we prove that
5  all this took place with Pete Martinez, that Pete Martinez
6  reclassified it, it just failed to get stamped somewhere, it
7  would have been over with.
8      Q.   But ultimately to be successful with the protest,
9  you would have to prove that the dumping fees should not have
10 been assessed, correct?
11     A.   I believe -- I believe that's basically correct.
12     Q.   I am going to hand you the last exhibit, Deposition
13 Exhibit 32.
14         (Exhibit 32 marked.)
15     Q.   (BY MS. HARDIN) I have handed you Deposition
16 Exhibit 32, and I'll ask you if you recognize that document?
17     A.   Yes, ma'am.
18     Q.   Okay. And if you turn to page 8, do you recognize
19 your signature?
20     A.   Yes.
21     Q.   Okay. I want to turn your attention to Question
22 Number 4, which is on deposition -- excuse me -- Question
23 Number 4, which is on page 3.
24         And do you see the answer to your -- to
25 Interrogatory Number 4?

56 (Pages 218 to 221)

Page 230

1  document it says that they would file a protest?
2      A.   Well, it says so they can take corrective action.
3      Q.   Okay.
4      A.   That's what it says. It doesn't say protest. It
5  says they will take corrective action. They will take care of
6  it.
7          MS. HARDIN:  Okay. Thank you, Mr. Terry. I
8  appreciate your time.
9          (A break was taken, 3:05 to 3:05 p.m.)
10     Q.   (BY MS. HARDIN)  I don't want to see what's on the
11 cover page because I know you wrote that to your attorney, but
12 let me see what the documents are behind that.
13     A.   I think you have got it. It's just the -- okay.
14         MS. HARDIN:  Let me mark this as Deposition
15 Exhibit 34.
16         (Exhibit 34 marked.)
17     Q.   (BY MS. HARDIN)  And if you'll identify this for me
18 real quickly. Will you identify what Deposition Exhibit 34 is
19 for us?
20     A.   It's -- looks like a demand letter from Customs
21 Homeland Security demanding 72,000 and change.
22     Q.   And what is that dated?
23     A.   June 18th, 2003. With attached individual bill
24 entry -- entry numbers.
25     Q.   And let's mark the next exhibit as Deposition

Page 231

1  Exhibit -- whatever is next.
2          THE REPORTER:  35.
3      Q.   (BY MS. HARDIN)  Will you identify what this
4  document is?
5      A.   It's another demand from Customs, for interest.
6          (Exhibit 35 marked.)
7      Q.   (BY MS. HARDIN)  Okay. I'll hand you Deposition
8  Exhibit 36, if you'll tell me what that is?
9          (Exhibit 36 marked.)
10     A.   Oh, 36 is original; 34 is a copy.
11     Q.   (BY MS. HARDIN)  So, it's the same thing?
12     A.   The same thing.
13     Q.   Okay. Let's de-mark Exhibit 36.
14         THE REPORTER:  Withdraw it?
15         MS. HARDIN:  Yeah.
16     Q.   (BY MS. HARDIN)  Okay. I am going to hand you the
17 new Deposition Exhibit 36 and ask you to identify it for us.
18     A.   It goes back -- it goes back to the drill pipe.
19     Q.   Isn't the date on there 2003, or am I wrong?
20     A.   Uh-huh. But it goes back to 1996 -- refers back to
21 '96. Read -- it read -- it looks to me like -- that there --
22 that the drill pipe besides the antidumping, there was a 6.4
23 duty just on all drill pipe; and plus there was a dumping fee,
24 the way -- it doesn't say anything about dumping fee.
25     Q.   So, would this be the document that you received

Page 232

1  from Customs that identify how they reclassified the pipe and
2  then charged the duty or the dumping fees?
3      A.   I can't tell you what the Government did.
4      Q.   Okay.
5      A.   Nothing they do makes sense.
6      Q.   This document was in your file, and you do remember
7  receiving it --
8      A.   Yes.
9      Q.   -- from Customs?
10     A.   It's dated up there when I received it, in my
11 handwriting.
12         And they tell you one thing, and they tell you
13 they're not liable for anything they tell you. It's just like
14 dealing with the IRS.
15         MS. HARDIN:  Okay. Pass the witness.
16         (Deposition concluded.)
17         MS. HARDIN:  Let the record reflect that we
18 are missing Exhibit Number 33. The deposition is concluded,
19 and Mr. Terry has left. It is our belief that Deposition
20 Exhibit Number 33 doesn't actually exist and that we
21 accidentally skipped that number in the preparation of
22 exhibits or identifying exhibits.
23         Let the record reflect that there were two documents
24 here by Mr. Terry. One of those documents is a privileged
25 document. I am giving that document to Kathy Miller to return

Page 233

1  to the plaintiff. The other document I am marking as
2  Deposition Exhibit 37 so that it, too, can be returned to
3  plaintiff.
4          (Exhibit 37 marked.)

59 (Pages 230 to 233)

Page 234

CHANGES AND SIGNATURE

1

2  PAGE   LINE   CHANGE        REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

---

Page 235

1       I, REX W. TERRY, have read the foregoing deposition
and hereby affix my signature that same is true and correct,
2  except as noted above.

3

4

5       _____
        REX W. TERRY
6

7

8  THE STATE OF _____)
   COUNTY OF _____)
9
       Before me, _____, on this day
10  personally appeared REX W. TERRY, known to me (or proved to me
    under oath or through _____)
11  (description of identity card or other document) to be the
    person whose name is subscribed to the foregoing instrument
12  and acknowledged to me that they executed the same for the
    purposes and consideration therein expressed.
13       Given under my hand and seal of office this
    _____ day of _____, _____.
14

15

16       _____
         NOTARY PUBLIC IN AND FOR
17       THE STATE OF _____
         COMMISSION EXPIRES: _____

18

19

20

21

22

23

24

25

---

Page 236

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2            BROWNSVILLE DIVISION
3                          )
   REX TERRY, ET AL        )
4                          )
5       PLAINTIFFS,     )
                         ) CIVIL ACTION
6  VS.                   )
                         ) NO.: B-03-190
7                          )
   PARKERCO, INC.          )
8                          )
                         )
9       DEFENDANT.     )
10

11  *********************************************

11            REPORTER'S CERTIFICATION
12         DEPOSITION OF REX W. TERRY
13             SEPTEMBER 2, 2004
14       I, Kathy Miller, Certified Shorthand Reporter in and for
15  the State of Texas, hereby certify to the following:
16       That the witness, REX W. TERRY, was duly sworn by the
17  officer and that the transcript of the oral deposition is a
18  true record of the testimony given by the witness;
19       That the deposition transcript was submitted on
20  _____ to the witness or to the attorney for the
21  witness for examination, signature and return to me by
22  _____;
23       That the amount of time used by each party at the
24  deposition is as follows:
25  MS. JULIE A. HARDIN.....5 HOURS

---

Page 237

1       That pursuant to information given to the deposition
2  officer at the time said testimony was taken, the following
3  includes counsel for all parties of record:
4  FOR THE PLAINTIFFS:
       MR. WILLIAM W. THOMPSON, III
5       GRISSOM & THOMPSON, LLP
        609 WEST 10TH STREET
6       AUSTIN, TEXAS 78701
7  FOR THE DEFENDANT:
       MS. JULIE A. HARDIN
8       FULBRIGHT & JAWORSKI
        1301 MCKINNEY, SUITE 5100
9       HOUSTON, TEXAS  77010
10       That $_____ is the deposition officer's charges to
11  the Defendant for preparing the original deposition transcript
12  and any copies of exhibits;
13       I further certify that I am neither counsel for, related
14  to, nor employed by any of the parties or attorneys in the
15  action in which this proceeding was taken, and further that I
16  am not financially or otherwise interested in the outcome of
17  the action.
18       Certified to by me this 16th of September, 2004.
19
20
21       _____
22       Kathy Miller
         Texas CSR No. 739
         Expiration Date:  12/31/04
23
         Nell McCallum & Associates
24       Firm Registration No. 243
25

60 (Pages 234 to 237)